GRAY *v.* NETHERLAND, WARDEN

No. 95–6510.   Argued April 15, 1996—Decided June 20, 1996

154

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 171. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined, *post*, p. 171.

*Mark Evan Olive*, by appointment of the Court, 516 U. S. 1170, argued the cause for petitioner. With him on the briefs were *Donald R. Lee, Jr., Paul G. Turner,* and *John H. Blume.*

*John H. McLees, Jr.,* Assistant Attorney General of Virginia, argued the cause for respondent. With him on the brief were *James S. Gilmore III,* Attorney General, and *David E. Anderson,* Chief Deputy Attorney General.*

---

*\*Kent S. Scheidegger* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging affirmance.

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner, convicted of capital murder, complains that his right to due process of law under the Fourteenth Amendment was violated because he was not given adequate notice of some of the evidence the Commonwealth intended to use against him at the penalty hearing of his trial. We hold that this claim would necessitate a "new rule," and that therefore it does not provide a basis on which he may seek federal habeas relief.

I

A

Richard McClelland was the manager of a department store, Murphy's Mart, in Portsmouth, Virginia. On May 2, 1985, at approximately 9:30 p.m., petitioner and Melvin Tucker, a friend, both under the influence of cocaine, parked in the parking lot of the Murphy's Mart and watched McClelland and a store security guard inside. Shortly before midnight, McClelland and the guard came out of the store and left in separate automobiles. With Tucker in the passenger seat, petitioner followed McClelland, pulled in front of his car at a stop sign, threatened him with a .32-caliber revolver, ordered him into petitioner's car, and struck him. Petitioner and Tucker took McClelland's wallet and threatened to harm his family if he did not cooperate. *Gray* v. *Commonwealth*, 233 Va. 313, 340–341, 356 S. E. 2d 157, 172, cert. denied, 484 U. S. 873 (1987).

Petitioner drove the car back to the Murphy's Mart, where he forced McClelland at gunpoint to reopen the store. They filled three gym bags with money, totaling between $12,000 and $13,000. Petitioner drove McClelland and Tucker to a service station, bought gasoline for his car and for a gas can in the car's trunk, and proceeded to a remote side road. He took McClelland 15 to 20 feet behind the car and ordered him to lie down. While McClelland begged petitioner not to

hurt or shoot him, petitioner assured him he would not be harmed. Having thus assured McClelland, petitioner fired six pistol shots into the back of his head in rapid succession. 233 Va., at 341–342, 356 S. E. 2d, at 172–173.

Leaving McClelland's dead body on the side road, petitioner and Tucker returned to the intersection where they had seized him. Petitioner, telling Tucker he wanted to destroy McClelland's car as evidence, doused its interior with gasoline and lit it with a match. *Id.*, at 341–342, 356 S. E. 2d, at 173.

Petitioner and Tucker were later arrested and indicted in the Circuit Court of the city of Suffolk on several counts, including capital murder. Having evidence that petitioner had announced before the killing that "he was going to get" McClelland for having fired his wife from her job as a saleswoman at the Murphy's Mart, and that petitioner had told other witnesses after the killing that he had performed it, the prosecutor entered into a plea bargain with Tucker. In return for being tried for first-degree murder instead of capital murder, Tucker would testify at petitioner's trial about events leading up to the killing and would identify petitioner as the actual "trigger man." *Id.*, at 331, 356 S. E. 2d, at 167.

## B

On Monday, December 2, 1985, petitioner's trial began. Petitioner's counsel moved that the trial court order the prosecution to disclose the evidence it planned to introduce in the penalty phase. The prosecutor acknowledged that "in the event [petitioner] is found guilty we do intend to introduce evidence of statements he has made to other people about other crimes he has committed of which he has not been convicted." 14 Record 8. In particular, the prosecution intended to show that petitioner had admitted to a notorious double murder in Chesapeake, a city adjacent to Suffolk. Lisa Sorrell and her 3-year-old daughter, Shanta, had been murdered five months before McClelland was killed.

The prosecutor told petitioner's counsel in court that the only evidence he would introduce would be statements by petitioner to Tucker or fellow inmates that he committed these murders. *Id.*, at 11.

On Thursday, December 5, 1985, the jury convicted petitioner on all counts. That evening, the prosecution informed petitioner's counsel that the Commonwealth would introduce evidence, beyond petitioner's own admissions, linking petitioner to the Sorrell murders. The additional evidence included photographs of the crime scene and testimony by the police detective who investigated the murders and by the state medical examiner who performed autopsies on the Sorrells' bodies. The testimony was meant to show that the manner in which Lisa and Shanta Sorrell had been killed resembled the manner in which McClelland was killed. The next morning, petitioner's counsel made two motions "to have excluded from evidence during [the] penalty trial any evidence pertaining to any . . . felony for which the defendant has not yet been charged." 18 *id.*, at 776. Counsel argued that the additional evidence exceeded the scope of unadjudicated-crime evidence admissible for sentencing under Virginia law, because "[i]n essence, what [the prosecutor is] doing is trying [the Sorrell] case in the minds of the jurors." *Id.*, at 724 (citing *Watkins* v. *Commonwealth*, 229 Va. 469, 331 S. E. 2d 422 (1985), cert. denied, 475 U. S. 1099 (1986)). Although counsel also complained that he was not "prepared for any of this [additional evidence], other than [that petitioner] may have made some incriminating statements," 18 Record 725, and that the "[d]efense was taken by surprise," *id.*, at 777, he never requested a continuance. The trial court denied the motions to exclude.

During the sentencing phase, Tucker testified that, shortly after the McClelland murder, petitioner pointed to a picture of Lisa Sorrell in a newspaper and told Tucker that he had "knocked off" Sorrell. Petitioner's counsel did not cross-examine Tucker. Officer Michael Slezak, who had investi-

gated the Sorrell murders, testified that he found Lisa's body in the front seat of a partially burned automobile and Shanta's body in the trunk. Dr. Faruk Presswalla, the medical examiner who had performed autopsies on the bodies, testified that Lisa was killed by six bullets to the head, shot from a .32-caliber gun. *Gray, supra,* at 345, 356 S. E. 2d, at 175. Petitioner's counsel did not cross-examine Dr. Presswalla, and only cross-examined Officer Slezak to suggest that McClelland's murder may have been a "copycat" murder, committed by a different perpetrator. 18 Record 793, 802.[1]

The jury fixed petitioner's sentence for McClelland's murder at death. The trial court entered judgment on the verdicts for all the charges against petitioner and sentenced him to death. The Virginia Supreme Court affirmed, 233 Va. 313, 356 S. E. 2d 157, and we denied certiorari, *Gray v. Virginia,* 484 U. S. 873 (1987). The Suffolk Circuit Court dismissed petitioner's state petition for a writ of habeas corpus. The Virginia Supreme Court affirmed the dismissal, and we denied certiorari. *Gray v. Thompson,* 500 U. S. 949 (1991).

## C

Petitioner then sought a writ of habeas corpus from the United States District Court for the Eastern District of Virginia. With respect to the Sorrell murders, he argued, *inter alia,* that he had "never been convicted of any of these crimes nor was he awaiting trial for these crimes," that the Commonwealth "did not disclose its intentions to use the

---

[1] The prosecutor introduced this testimony as evidence of petitioner's future dangerousness. The prosecutor also introduced into evidence petitioner's criminal record, which included 13 felony convictions, at least 9 of which were for crimes of violence, including armed robbery and malicious wounding. Petitioner's record revealed that he had locked a restaurant's employees in a food freezer while robbing the restaurant, and threatened the lives of two persons other than McClelland. *Gray v. Commonwealth,* 233 Va. 313, 353, 356 S. E. 2d 157, 179, cert. denied, 484 U. S. 873 (1987).

Sorrell murders as evidence against [him] until such a late date that it was impossible for [his] defense counsel reasonably to prepare or defend against such evidence at trial," and that Tucker "'sold' his testimony to the Commonwealth for . . . less than a life sentence." 1 Joint Appendix in No. 94–4009 (CA4), pp. 32–33 (hereinafter J. A.).

The Commonwealth moved to dismiss the petition. To clarify its arguments against petitioner's Sorrell murder claim, it characterized petitioner's allegations as seven separate subclaims. The first subclaim asserted that petitioner was given "inadequate notice of the evidence which the Commonwealth intended to introduce to permit him to defend against it," and the third, relying on Brady v. Maryland, 373 U. S. 83 (1963), asserted that "[t]he Commonwealth failed to disclose evidence tending to prove that someone else had committed the Sorrell murders."[2] Respondent's Brief in Support of Motion to Dismiss in No. 3:91CV693 (ED Va.), p. 2. According to the Commonwealth, the notice-of-evidence subclaim was meritless and could not be the basis for relief in federal habeas corpus proceedings because it sought the retroactive application of a new rule of constitutional law. Id., at 18–19, 19–20. The Commonwealth alleged that the Brady subclaim had not been presented to the state courts on direct appeal or in state habeas corpus proceedings, and was thus procedurally barred under Va. Code Ann. § 8.01–654(B)(2) (1992). Respondent's Brief in Support of Motion to Dismiss, supra, at 19.

Initially, the District Court dismissed the habeas petition. The court adopted the Commonwealth's characterization of petitioner's Sorrell claim. See 1 J. A. 193. The court held that petitioner was not entitled to relief on the notice-of-evidence subclaim, because he "has no constitutional right to notice of individual items of testimony which the Com-

---

[2] The other five subclaims are not relevant to our review.

monwealth intends to introduce at the penalty phase." *Id.,* at 194. The court declined to review the *Brady* subclaim because it was procedurally barred. 1 J. A. 194.

Later, on petitioner's motion, the District Court amended its judgment to find within petitioner's Sorrell claim a specific due process claim about the admissibility of the Sorrell murder evidence. *Id.,* at 252. (In amending this judgment, the court announced that it remained unchanged as to the remaining claims, which it had dismissed. *Id.,* at 251.) After holding an evidentiary hearing on the Sorrell claim, the District Court ordered that petitioner be granted a writ of habeas corpus. The court characterized the claim as an allegation that petitioner "was denied due process of law under the Fourteenth Amendment of the United States Constitution because the Commonwealth failed to provide fair notice that evidence concerning the Sorrell murders would be introduced at his penalty phase." App. 348. Citing *Gardner* v. *Florida,* 430 U. S. 349, 357–359 (1977), the court determined that there was a constitutional defect in petitioner's penalty phase hearing: "Petitioner was confronted and surprised by the testimony of officer Slezak and Dr. Presswalla." App. 349. This defect "violated [petitioner's] right to fair notice and rendered the hearing clearly unreliable," because petitioner's attorneys had less than one day's notice of the additional evidence to be used against their client. *Id.,* at 349–350.

The Commonwealth appealed, arguing to the Fourth Circuit that to grant petitioner habeas relief would give him the benefit of a new rule of federal constitutional law, in violation of *Teague* v. *Lane,* 489 U. S. 288 (1989). The Fourth Circuit reversed the judgment granting the writ, rejected petitioner's cross-appeals from the dismissal of several other claims, and remanded with directions that the habeas corpus petition be dismissed. *Gray* v. *Thompson,* 58 F. 3d 59, 67 (1995). The court distinguished *Gardner,* on which the District Court had relied, because petitioner, unlike Gardner, "was

not sentenced on the basis of any secret information." 58 F. 3d, at 64. The court thus concluded that petitioner's notice-of-evidence claim "was not compelled by existing precedent at the time his conviction became final," and thus could not be considered in federal habeas proceedings under *Teague.* 58 F. 3d, at 64.

The Commonwealth scheduled petitioner's execution for December 14, 1995. Petitioner applied for a stay of execution and petitioned for a writ of certiorari from this Court. We granted his stay application on December 13, 1995. 516 U. S. 1034. On January 5, 1996, we granted certiorari, limited to the questions whether petitioner's notice-of-evidence claim stated a new rule and whether the Commonwealth violated petitioner's due process rights under *Brady* by withholding evidence exculpating him from responsibility for the Sorrell murders. 516 U. S. 1037; see Pet. for Cert. i.

## II

We first address petitioner's *Brady* claim. The District Court determined that "[t]his claim was not presented to the Supreme Court of Virginia on direct appeal nor in state habeas corpus proceedings," and that "the factual basis of the claim was available to [petitioner] at the time he litigated his state habeas corpus petition," and dismissed the claim on this basis. 1 J. A. 194. Petitioner does not contest these determinations in this Court.

Petitioner's failure to raise his *Brady* claim in state court implicates the requirements in habeas of exhaustion and procedural default. Title 28 U. S. C. § 2254(b) bars the granting of habeas corpus relief "unless it appears that the applicant has exhausted the remedies available in the courts of the State." Because "[t]his requirement ... refers only to remedies still available at the time of the federal petition," *Engle* v. *Isaac,* 456 U. S. 107, 126, n. 28 (1982), it is satisfied "if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law," *Castille* v. *Peoples,* 489 U. S.

346, 351 (1989). However, the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default. *Teague* v. *Lane, supra,* at 298; *Isaac, supra,* at 126, n. 28, 129; *Wainwright* v. *Sykes,* 433 U. S. 72, 90–91 (1977).

In Virginia, "[n]o writ [of habeas corpus ad subjiciendum] shall be granted on the basis of any allegation the facts of which petitioner had knowledge at the time of filing any previous petition." Va. Code Ann. § 8.01–654(B)(2) (1992). Because petitioner knew of the grounds of his *Brady* claim when he filed his first petition, § 8.01–654(B)(2) precludes review of petitioner's claim in any future state habeas proceeding. Because petitioner makes no attempt to demonstrate cause or prejudice for his default in state habeas proceedings, his claim is not cognizable in a federal suit for the writ.

## III

### A

Petitioner makes a separate due process challenge to the manner in which the prosecution introduced evidence about the Sorrell murders. We perceive two separate claims in this challenge. As we will explain in greater detail below, petitioner raises a "notice-of-evidence" claim, which alleges that the Commonwealth deprived petitioner of due process by failing to give him adequate notice of the evidence the Commonwealth would introduce in the sentencing phase of his trial. He raises a separate "misrepresentation" claim, which alleges that the Commonwealth violated due process by misleading petitioner about the evidence it intended to use at sentencing.

In *Picard* v. *Connor,* 404 U. S. 270 (1971), we held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal

constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief. We considered whether a habeas petitioner was entitled to relief on the basis of a claim, which was not raised in the state courts or in his federal habeas petition, that the indictment procedure by which he was brought to trial violated equal protection. *Id.*, at 271. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, at 278, we rejected the contention that the petitioner satisfied the exhaustion requirement of 28 U. S. C. § 2254(b) by presenting the state courts only with the facts necessary to state a claim for relief. "The [state court] dealt with the arguments [the habeas petitioner] offered; we cannot fault that court for failing also to consider *sua sponte* whether the indictment procedure denied [the petitioner] equal protection of the laws." *Id.*, at 277.

We have also indicated that it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In *Anderson* v. *Harless*, 459 U. S. 4 (1982), the habeas petitioner was granted relief on the ground that it violated due process for a jury instruction to obviate the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.*, at 7 (citing *Sandstrom* v. *Montana*, 442 U. S. 510 (1979)). The only manner in which the habeas petitioner had cited federal authority was by referring to a state-court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." 459 U. S., at 7 (internal quotation marks omitted). Our review of the record satisfied us that the *Sandstrom* claim "was never presented to, or considered by, the [state] courts," but we found it especially significant that the "broad federal due process right" that the habeas petition might have been read to incorporate did not include "the more particular analysis developed in cases such as *Sandstrom*." 459 U. S., at 7.

The due process challenge in petitioner's brief relies on two "particular analys[es]" of due process. *Ibid.* Relying on cases like *Gardner* v. *Florida,* 430 U. S. 349 (1977), and *Skipper* v. *South Carolina,* 476 U. S. 1 (1986), petitioner argues that he should have been given "'such notice of the issues involved in the [sentencing] hearing as [would have] reasonably enable[d] him to prepare his case,'" Brief for Petitioner 32 (quoting B. Schwartz, Administrative Law 283 (2d ed. 1984)), and that he was denied "a fair opportunity to be heard on determinative sentencing issues," Brief for Petitioner 33. This right stems from the defendant's "legitimate interest in the character of the procedure which leads to the imposition of sentence" of death, *Gardner,* 430 U. S., at 358, which justifies giving him an "opportunity to deny" potentially determinative sentencing information, *id.,* at 362.

"Yet another way in which the state may unconstitutionally . . . deprive [a defendant] of a meaningful opportunity to address the issues, is simply by misinforming him." Brief for Petitioner 34. Petitioner cites *In re Ruffalo,* 390 U. S. 544 (1968), *Raley* v. *Ohio,* 360 U. S. 423 (1959), and *Mooney* v. *Holohan,* 294 U. S. 103 (1935), for this proposition. *Ruffalo* was a disbarment proceeding in which this Court held that the disbarred attorney had not been given notice of the charges against him by the Ohio committee which administered bar discipline. 390 U. S., at 550. In *Raley,* the chairman and members of a state investigating commission assured witnesses that the privilege against self-incrimination was available to them, but when the witnesses were convicted for contempt the Supreme Court of Ohio held that a state immunity statute rendered the Fifth Amendment privilege unavailable. 360 U. S., at 430–434. And in *Mooney* v. *Holohan,* the defendant alleged that the prosecution knowingly used perjured testimony at his trial. 294 U. S., at 110.

*Gardner, Ruffalo, Raley,* and *Mooney* arise in widely differing contexts. *Gardner* forbids the use of secret testimony in the penalty proceeding of a capital case which the

defendant has had no opportunity to consider or rebut. *Ruffalo* deals with a defendant's right to notice of the charges against him. Whether or not *Ruffalo* might have supported petitioner's notice-of-evidence claim, see *infra*, at 169–170, it does not support the misrepresentation claim for which petitioner cites it. *Mooney* forbade the prosecution to engage in "a deliberate deception of court and jury." 294 U. S., at 112. *Raley*, though involving no deliberate deception, held that defendants who detrimentally relied on the assurance of a committee chairman could not be punished for having done so. *Mooney*, of course, would lend support to petitioner's claim if it could be shown that the prosecutor deliberately misled him, not just that he changed his mind over the course of the trial. The two claims are separate.

## B

The Commonwealth argues that the misrepresentation claim "was never argued before in any court." Brief for Respondent 39. If petitioner never presented this claim on direct appeal or in state habeas proceedings, federal habeas review of the claim would be barred unless petitioner could demonstrate cause and prejudice for his failure to raise the claim in state proceedings. *Supra*, at 161–162. If the claim was not raised or addressed in federal proceedings, below, our usual practice would be to decline to review it. *Yee* v. *Escondido*, 503 U. S. 519, 533 (1992).

There is some ambiguity as to whether the misrepresentation claim was raised or addressed in the District Court or the Court of Appeals. On the one hand, the District Court ordered relief primarily on the basis of *Gardner*, *i. e.*, lack of notice. *Supra*, at 160. On the other hand, some of the District Court findings advert to a deliberate decision by the prosecutor to mislead petitioner's counsel for tactical advantage. See, *e. g.*, App. 348, 350. The ambiguity in the federal record complicates the state-court procedural default issue, because procedural default is an affirmative defense for the

Commonwealth. If the misrepresentation claim was addressed at some stage of federal proceedings, the Commonwealth would have been obligated to raise procedural default as a defense, or lose the right to assert the defense thereafter. See *Jenkins* v. *Anderson*, 447 U. S. 231, 234, n. 1 (1980); see also *Schiro* v. *Farley*, 510 U. S. 222, 227–228 (1994).

We remand for the Court of Appeals to determine whether petitioner in fact raised what in his briefs on the merits to this Court he asserts has been his "fundamental complaint throughout this litigation . . . : the Commonwealth's affirmative misrepresentation regarding its presentation of the Sorrell murders . . . deprived Petitioner of a fair sentencing proceeding." Reply Brief for Petitioner 4–5. If the misrepresentation claim was raised, the Court of Appeals should consider whether the Commonwealth has preserved any defenses to it and proceed to consider the claim and preserved defenses as appropriate.

C

We turn to the notice-of-evidence claim, and consider whether the Court of Appeals correctly concluded that this claim sought the retroactive application of a new rule of federal constitutional law. We have concluded that the writ's purpose may be fulfilled with the least intrusion necessary on States' interest of the finality of criminal proceedings by applying constitutional standards contemporaneous with the habeas petitioner's conviction to review his petition. See *Teague*, 489 U. S., at 309–310 (opinion of O'CONNOR, J.). Thus, habeas relief is appropriate only if "a state court considering [the petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." *Saffle* v. *Parks*, 494 U. S. 484, 488 (1990).

At the latest, petitioner knew at the start of trial that the prosecutor intended to introduce evidence tending to show that he committed the Sorrell murders. He knew then that the Commonwealth would call Tucker to the stand to

repeat his statement that petitioner had admitted to committing the murders.[3]   See App. 340; 14 Record 8–9.  He nonetheless contends that he was deprived of adequate notice of the *other* witnesses, the police officer and the medical examiner who had investigated the Sorrell murders, whom he was advised that the prosecutor would call only on the evening before the sentencing hearing.  App. 342; 18 Record 777.  But petitioner did not attempt to cure this inadequacy of notice by requesting more time to respond to this evidence.  He instead moved "to have excluded from evidence during this penalty trial any evidence pertaining to any other—any felony for which the defendant has not yet been charged."[4]   *Id.*, at 776.

On these facts, for petitioner to prevail on his notice-of-evidence claim, he must establish that due process requires that he receive more than a day's notice of the Commonwealth's evidence.  He must also establish that due process required a continuance whether or not he sought one, or that, if he chose not to seek a continuance, exclusion was the only appropriate remedy for the inadequate notice.  We conclude that only the adoption of a new constitutional rule could establish these propositions.

A defendant's right to notice of the charges against which he must defend is well established.  *In re Ruffalo*, 390 U. S.

---

[3] When petitioner did object later, at the start of the penalty phase, to the admission of all the Sorrell murder evidence, counsel conceded that he would have been prepared to refute such evidence if it had consisted only of testimony by Tucker or petitioner's fellow inmates that petitioner had admitted to killing the Sorrells.  See 18 Record 722, 780.

[4] The District Court described petitioner's counsel as having made a "plea for additional time to prepare."  App. 343.  The Court of Appeals found this plea insufficient to have legal effect in court: "If the defense felt unprepared to undertake effective cross-examination, one would think a formal motion for continuance would have been forthcoming, but none was ever made; counsel moved only that the evidence be excluded."  *Gray* v. *Thompson*, 58 F. 3d 59, 64 (CA4 1995).  We agree with the Court of Appeals.

544 (1968); *Cole* v. *Arkansas*, 333 U. S. 196 (1948). But a defendant's claim that he has a right to notice of the *evidence* that the state plans to use to prove the charges stands on quite a different footing. We have said that "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded." *Wardius* v. *Oregon*, 412 U. S. 470, 474 (1973). In *Weatherford* v. *Bursey*, 429 U. S. 545 (1977), we considered the due process claim of a defendant who had been convicted with the aid of surprise testimony of an accomplice who was an undercover agent. Although the prosecutor had not intended to introduce the agent's testimony, he changed his mind the day of trial. *Id.*, at 549. To keep his cover, the agent had told the defendant and his counsel that he would not testify against the defendant. *Id.*, at 560. We rejected the defendant's claim, explaining that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady*," which addressed only exculpatory evidence, "did not create one," *id.*, at 559. To put it mildly, these cases do not compel a court to order the prosecutor to disclose his evidence; their import, in fact, is strongly against the validity of petitioner's claim.

Petitioner relies principally on *Gardner* v. *Florida*, 430 U. S. 349 (1977), for the proposition that a defendant may not be sentenced to death "on the basis of information which he had no opportunity to deny or explain." *Id.*, at 362 (opinion of STEVENS, J.). In *Gardner*, the trial court sentenced the defendant to death relying in part on evidence assembled in a presentence investigation by the state parole commission; the "investigation report contained a confidential portion which was not disclosed to defense counsel." *Id.*, at 353. Gardner literally had no opportunity to even see the confidential information, let alone contest it. Petitioner in the present case, on the other hand, had the opportunity to hear the testimony of Officer Slezak and Dr. Presswalla in open court, and to cross-examine them. His claim to notice is

much more akin to the one rejected in *Weatherford, supra,* than to the one upheld in *Gardner.*

Even were our cases otherwise on the notice issue, we have acknowledged that exclusion of evidence is not the sole remedy for a violation of a conceded right to notice of an alibi witness. In *Taylor* v. *Illinois,* 484 U. S. 400 (1988), we said that in this situation "a less drastic sanction is always available. Prejudice . . . could be minimized by granting a continuance." *Id.,* at 413. Here, counsel did not request a continuance; he argued only for exclusion. Counsel argued that the evidence should be excluded not only because he was not prepared to contest the evidence, but also because it exceeded the standard in Virginia, *Watkins* v. *Commonwealth,* 229 Va. 469, 331 S. E. 2d 422 (1985), for relevance of unsolved-crime evidence to sentencing. See 18 Record 723. In view of petitioner's insistence on exclusion of the evidence, the trial court might well have felt that it would have been interfering with a tactical decision of counsel to order a continuance on its own motion.

The dissent argues that petitioner seeks the benefit of a well-established rule, that "a capital defendant must be afforded a meaningful opportunity to explain or deny the evidence introduced against him at sentencing." *Post,* at 180. Because we disagree with the dissent's assertion that petitioner moved for a continuance, we disagree with its characterization of the constitutional rule underlying his claim for relief. Compare *supra,* at 166–167, and n. 4, with *post,* at 184–185, n. 11. The dissent glosses over the similarities between this case and *Weatherford,* which " 'dictate[s],' " *post,* at 180, the disposition of petitioner's claim— adversely to petitioner—more clearly than any precedent cited by the dissent. But even without *Weatherford* and petitioner's failure to move for a continuance, we would still think the new-rule doctrine "would be meaningless if applied at this level of generality." *Sawyer* v. *Smith,* 497 U. S. 227, 236 (1990). We therefore hold that petitioner's notice-of-

evidence claim would require the adoption of a new constitutional rule.

### D

Petitioner argues that relief should be granted nonetheless, because the new rule he proposes falls within one of *Teague*'s two exceptions. "The first exception permits the retroactive application of a new rule if the rule places a class of private conduct beyond the power of the State to proscribe." *Parks*, 494 U. S., at 494 (citing *Teague*, 489 U. S., at 311). This exception is not at issue here. "The second exception is for 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Parks, supra*, at 495 (citing *Teague, supra*, at 311; *Butler* v. *McKellar*, 494 U. S. 407, 416 (1990)). Petitioner argues that his notice-of-evidence new rule is "mandated by long-recognized principles of fundamental fairness critical to accuracy in capital sentencing determinations." Brief for Petitioner 47.

We observed in *Saffle* v. *Parks* that the paradigmatic example of a watershed rule of criminal procedure is the requirement that counsel be provided in all criminal trials for serious offenses. 494 U. S., at 495 (citing *Gideon* v. *Wainwright*, 372 U. S. 335 (1963)). "Whatever one may think of the importance of [petitioner's] proposed rule, it has none of the primacy and centrality of the rule adopted in *Gideon* or other rules which may be thought to be within the exception." *Parks, supra*, at 495. The rule in *Teague* therefore applies, and petitioner may not obtain habeas relief on his notice-of-evidence claim.

### IV

We hold that petitioner's *Brady* claim is procedurally defaulted and that his notice-of-evidence claim seeks retroactive application of a new rule. Neither claim states a ground upon which relief may be granted in federal habeas corpus proceedings. However, we vacate the judgment of

the Court of Appeals and remand the case for consideration of petitioner's misrepresentation claim in proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

JUSTICE GINSBURG has cogently explained why well-settled law requires the reversal of the judgment of the Court of Appeals. I join her opinion with this additional observation. The evidence tending to support the proposition that petitioner committed the Sorrell murders was not even sufficient to support the filing of charges against him. Whatever limits due process places upon the introduction of evidence of unadjudicated conduct in capital cases, they surely were exceeded here. Given the "vital importance" that "any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion," the sentencing proceeding would have been fundamentally unfair even if the prosecutors had given defense counsel fair notice of their intent to offer this evidence. See *Gardner* v. *Florida*, 430 U. S. 349, 357–358 (1977) (opinion of STEVENS, J.).

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

Basic to due process in criminal proceedings is the right to a full, fair, potentially effective opportunity to defend against the State's charges. Petitioner Gray was not accorded that fundamental right at the penalty phase of his trial for capital murder. I therefore conclude that no "new rule" is implicated in his petition for habeas corpus, and dissent from the Court's decision, which denies Gray the resentencing proceeding he seeks.

I

Petitioner Coleman Gray's murder trial began on Monday, December 2, 1985, in the city of Suffolk, Virginia. He was

charged with killing Richard McClelland during the commission of a robbery, a capital offense. Va. Code Ann. § 18.2–31(4) (Supp. 1995). Under Virginia law, the trial would proceed in two stages: During the guilt phase, the jury would determine whether Gray was guilty of capital murder; and during the penalty phase, the jury would decide whether Gray should be sentenced to death or life imprisonment. See Va. Code Ann. § 19.2–264.4(A) (1995).

At an in-chambers conference before the guilt phase began, Gray's lawyers requested a court order directing the prosecutor to disclose the evidence he would introduce during the penalty phase if Gray were convicted.[1] Defense counsel wanted to know, in particular, whether the prosecutor planned to introduce evidence relating to the murders of Lisa Sorrell and her 3-year-old daughter, Shanta. Defense counsel informed the trial court of the basis for the request:

> ". . . Your Honor, this is my concern. We will probably at the very best stop in the middle of the day or late in the afternoon and start the penalty trial the next day. . . . [W]e have good reason to believe that [the prosecutor] is going to call people to introduce a statement that our client supposedly made to another inmate that he murdered [the Sorrells] which were very violent and well-known crimes throughout this entire area.
>
> "If that comes in we are going to want to know it in advance so we can be prepared on our argument. . . . It's absolute dynamite." 3 Joint Appendix in No. 94–4009 (CA4), pp. 1328–1329 (hereinafter J. A.).

---

[1] This request was made pursuant to *Peterson* v. *Commonwealth*, 225 Va. 289, 302 S. E. 2d 520 (1983), which instructed that, under Virginia law, the "preferred practice" in capital trials "is to make known to [the defendant] before trial the evidence that is to be adduced at the penalty stage if he is found guilty." *Id.*, at 298, 302 S. E. 2d, at 526.

The Sorrell murders "were one of the most highly publicized crimes in the history of the Tidewater, Virginia area." App. 341.   In December 1984, five days after they were reported missing, Lisa and Shanta Sorrell were found dead in a partially burned car in Chesapeake, Virginia, a city that shares borders with Suffolk.   Lisa's body was slumped in the front passenger seat of the car; she had been shot in the head six times.   Shanta had been removed from her car seat and locked in the trunk, where she died after inhaling smoke produced by the fire in the car's passenger compartment. Neither Gray nor anyone else has ever been charged with commission of the Sorrell murders.[2]

In response to defense counsel's disclosure request, the prosecutor told Gray's lawyers and the court that he would introduce "statements". Gray had made to other inmates in which Gray allegedly admitted killing the Sorrells.   The following exchange then took place between defense counsel Moore and prosecutor Ferguson:

> "MR. MOORE: Is it going to be evidence or just his statement?
> "MR. FERGUSON: Statements that your client made.
> "MR. MOORE: *Nothing other than statements?*
> "MR. FERGUSON: To other people, *that's correct.* Statements made by your client that he did these things."   3 J. A. 1331 (emphasis added).

---

[2] That Gray had not been convicted of killing the Sorrells would not, under Virginia law, bar admission of evidence relating to those crimes during the penalty phase of his trial.   One of Virginia's two aggravating circumstances requires the jury to determine whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society."   Va. Code Ann. § 19.2–264.2 (1995).   The Virginia Supreme Court has held that "evidence of prior unadjudicated criminal conduct . . . may be used in the penalty phase to prove the defendant's propensity to commit criminal acts of violence in the future."   *Watkins* v. *Commonwealth,* 229 Va. 469, 488, 331 S. E. 2d 422, 436 (1985).

174

After the in-chambers conference ended, the guilt phase of the trial began. Three days later, at 4 o'clock on Thursday afternoon, December 5, the jury returned a verdict finding Gray guilty of the capital murder of McClelland. Proceedings were adjourned for the day, with the penalty phase to begin at 9:30 the next morning.

That evening, the prosecutor informed defense counsel that, in addition to Gray's statements, he planned to introduce further evidence relating to the Sorrell murders. That further evidence included: (1) the testimony of Detective Slezak, the police officer who investigated the Sorrell murders, regarding his observations at the crime scene shortly after the bodies of Lisa and Shanta were discovered; (2) graphic photographs of the crime scene, depicting the interior of the partially burned car, Lisa's body in the front seat, and Shanta's body in the trunk; (3) the testimony of Doctor Presswalla, the state medical examiner who conducted the autopsies of the victims, regarding the causes of their deaths; (4) graphic photographs of the victims at the time of the autopsies, including a photograph depicting the back of Lisa's head, shaved to reveal six gunshot wounds; and (5) Doctor Presswalla's autopsy reports. See App. 29–37, 40–47.

This additional evidence, advanced by the prosecutor on the eve of the penalty phase, suggested that the Sorrell murders were carried out in a manner "strikingly similar" to the murder of McClelland. *Gray* v. *Commonwealth*, 233 Va. 313, 347, 356 S. E. 2d 157, 176 (1987). Like Lisa Sorrell, McClelland had been shot six times in the head; his car, too, had been partially burned. As defense counsel later explained, "the similarities between the McClelland murder and the Sorrell murder would be obvious to anyone sitting in a jury box." App. 141.

On Friday morning, December 6, before trial proceedings resumed, defense counsel informed the court of Thursday evening's developments. Gray's lawyers told the court they had learned for the first time the previous evening that the

prosecutor planned to introduce evidence relating to the Sorrell murders other than Gray's alleged statements. Counsel stated that while they were prepared to rebut the statements, they were "not prepared to rebut [the additional evidence] . . . because of the shortness of notice." 4 J. A. 2065. "We are not prepared to try the Sorrell murder today," counsel told the court. "We have not been given sufficient notice." *Ibid.*

Gray's lawyers argued that the case relied on by the prosecutor, *Watkins* v. *Commonwealth,* 229 Va. 469, 331 S. E. 2d 422 (1985), was distinguishable. There, counsel explained, separate murder charges were outstanding against the defendant, and "[t]he lawyers who were representing [Watkins] in the first murder trial were already representing him with respect to the second murders. They were aware of all the charges, were aware of the evidence that was available to the Commonwealth in the second murder charge and were in a position to confront the evidence . . . that would come in [during] the penalty trial." 4 J. A. 2065–2066. In contrast to the situation in *Watkins,* counsel pointed out, "[w]e are not prepared for any of this, other than [Gray] may have made some incriminating statements." 4 J. A. 2067. The trial court nonetheless ruled that the Sorrell murders evidence was "admissible at this stage of the trial." *Id.,* at 2068.

The penalty phase of the trial then commenced. The prosecutor, in keeping with his representations before the guilt phase began, called Melvin Tucker to the stand. Tucker was Gray's accomplice in the McClelland murder; he, along with Gray, had initially been charged with capital murder. After plea negotiations, however, the prosecutor agreed to reduce the charge against Tucker to first-degree murder, a noncapital offense, in exchange for Tucker's testimony against Gray. App. 339, and n. 3. Tucker testified during the guilt phase that Gray had been the "trigger man" in McClelland's murder.

Tucker testified at the penalty phase that, shortly after the McClelland robbery, he and Gray "were searching through the newspaper for some information" on the crime. *Id.*, at 22. According to Tucker, Gray stated that he had "knocked off" Lisa Sorrell, and pointed to a picture of Lisa Sorrell in the newspaper. *Id.*, at 22–23.[3] Gray's lawyers declined to cross-examine Tucker after his penalty phase testimony; in their view, Tucker's motive to lie had already been adequately exposed during the guilt phase. See *id.*, at 157 (testimony of defense counsel Moore) ("Melvin Tucker had been . . . extensively . . . cross-examined during the guilt phase . . . . The same jurors who were sitting there during the guilt trial were there during the penalty phase and they had been told and drawn a pretty accurate picture as to why Melvin Tucker would strike a deal and tell anybody anything they wanted to hear. To save his life. That didn't need to be brought up again.").

The prosecutor then called Detective Slezak. Defense counsel renewed their objection, outside the presence of the jury, to admission of any evidence relating to the Sorrell murders other than Gray's statements. Counsel reiterated that they had "had no notice of this," and had been "taken by surprise." *Id.*, at 25. What the prosecutor "is going to do today," they emphasized, "is not what he said he was going to do at the beginning of trial." *Id.*, at 27. The court adhered to its earlier ruling that the evidence was admissible.

With nothing more than Tucker's testimony linking Gray to the Sorrell murders, the trial court then allowed the prosecutor to introduce the testimony of Detective Slezak and Doctor Presswalla, as well as crime scene and autopsy

---

[3] As the District Court suggested, in one respect this version of events is implausible. The McClelland murder occurred in May 1985, some six months after the Sorrells had been killed. No newspaper from May 1985 containing a photograph of Lisa Sorrell was ever introduced into evidence. See App. 343.

photographs and the victims' autopsy reports. See *ante*, at 157–158. During the defense case, Gray took the stand, admitted complicity in the McClelland murder but denied being the "triggerman," and denied any involvement in the Sorrell murders. App. 346–347. After closing arguments, in which the prosecutor highlighted the similarities between the Sorrell and McClelland murders, and urged that Gray's commission of the Sorrell murders demonstrated his "future dangerous[ness]," see *id.*, at 51–53, the jury fixed Gray's punishment at death.

Gray unsuccessfully argued on direct appeal to the Virginia Supreme Court and in state habeas proceedings that admission of the additional Sorrell murders evidence violated his right to a fair trial under the Fourteenth Amendment. Gray then filed a federal habeas petition in the United States District Court for the Eastern District of Virginia. Gray argued, among other things, that admission of the Sorrell murders evidence violated his Fourteenth Amendment rights. 1 J. A. 35. Specifically, he asserted:

> "The Commonwealth did not disclose its intentions to use the Sorrell murders as evidence against Gray until such a late date that it was impossible for Gray's defense counsel reasonably to prepare or defend against such evidence at trial. Because of the late notice, . . . Gray could not adequately prepare to defend his innocence regarding the Sorrell murders." *Id.*, at 33.

The District Court concluded that other claims pressed by Gray in his federal habeas petition were either procedurally barred or meritless. The court found, however, that the Sorrell evidence claim "was consistently raised in the State courts and is not procedurally defaulted." *Id.*, at 253.

After conducting an evidentiary hearing, the District Court granted Gray a writ of habeas corpus. Relying primarily on *Gardner* v. *Florida*, 430 U. S. 349 (1977), the court held that Gray's due process rights were violated "because

the Commonwealth failed to provide fair notice that evidence concerning the Sorrell murders would be introduced at his penalty phase," App. 348; consequently, Gray became vulnerable to a death sentence on the basis of information he had scant opportunity to deny or explain, see *id.*, at 349–351. Recalling the prosecutor's Monday morning affirmations that he would introduce only Gray's "statements," the District Court noted that Gray's lawyers were "clearly and justifiably . . . shocked" when the prosecutor reported, Thursday evening, his intention to introduce, the next day, further evidence on the Sorrell murders. *Id.*, at 350. "The only Sorrell murder evidence which [Gray's lawyers] were prepared to challenge," the District Court recounted, "was the evidence [the prosecutor] indicated he would introduce at the outset of the trial: Melvin Tucker's statement that Gray allegedly had confessed to the murders." *Id.*, at 346. The prosecutor's surprise move had disarmed Gray's counsel, the District Court recognized, leaving them without capacity to cross-examine Detective Slezak and Doctor Presswalla effectively, with the result that the Sorrell murders evidence "carrie[d] no assurance of reliability." *Id.*, at 351.

"The consequences of this surprise," the District Court found, "could not have been more devastating." *Id.*, at 350. Most critically, the prosecutor's "statements only" assurance led defense counsel to forgo investigation of the details of the Sorrell murders, including a review of the evidence collected by the Chesapeake police department during its investigation of the crimes. See *ibid.* Had Gray's lawyers conducted such a review, they could have shown that none of the forensic evidence collected by the Chesapeake police directly linked Gray to the Sorrell murders.[4] Moreover, the evidence the Chesapeake police did obtain "strongly sug-

---

[4] The District Court noted, in this regard, that an investigator engaged by Gray's federal habeas counsel had run a driving test indicating that "Coleman Gray could not have performed the Sorrell murders on his wife's dinner hour, as the prosecutor speculated." *Id.*, at 345, n. 5.

gested that Timothy Sorrell"—Lisa's husband and Shanta's father—"actually committed the notorious murders." *Id.*, at 350–351.

Indeed, for a substantial period of time following the Sorrell murders, Timothy Sorrell was the prime suspect in the case.[5] Police suspicion focused on Mr. Sorrell the night Lisa and Shanta were found dead. When Detective Slezak and another officer informed Mr. Sorrell of the grim discovery, his statements and demeanor made the officers "highly suspicious." *Id.*, at 186.[6]

Police subsequently learned that Timothy Sorrell had an apparent motive for the murders. Two weeks before Lisa and Shanta were killed, the Sorrells obtained a life insurance policy, which designated Timothy and Shanta as beneficiaries in the event of Lisa's death. *Id.*, at 344.[7] Lisa's parents later filed a lawsuit to stop Mr. Sorrell from obtaining the proceeds of the insurance policy, alleging that he was responsible for Lisa's death. *Ibid.* In addition, police uncovered evidence suggesting that Mr. Sorrell was involved in a stolen merchandise ring at his place of employment, the Naval Supply Center, and that Lisa "was very angry and unhappy about her husband's apparent criminal activities." *Id.*, at 345.[8] Based on this information, Detective Slezak asked the

---

[5] Police designated Mr. Sorrell as the sole suspect on evidence they sent to crime labs for analysis. *Id.*, at 344.

[6] Asked to describe what about Mr. Sorrell's demeanor made him suspicious, Slezak testified: "I don't know how to describe it other than to say that it was not what you would expect to find in a situation like that. He just seemed defensive." *Id.*, at 186.

[7] By contrast, police never established Gray's supposed motive for killing the Sorrells. Lisa was found with her jewelry (a necklace and gold earrings) undisturbed, as well as cash and a postal money order for $280, *id.*, at 316, suggesting that robbery was not the perpetrator's motive, *id.*, at 317.

[8] Despite defense counsel's pretrial request for all exculpatory evidence pursuant to *Brady* v. *Maryland*, 373 U. S. 83 (1963), the prosecutor never disclosed the evidence incriminating Timothy Sorrell. Gray presented a *Brady* claim in his federal habeas petition, but the District Court noted

local Commonwealth's Attorney "to determine whether it was appropriate to prosecute Timothy Sorrell." *Ibid.*[9]

Assessing the prejudicial potency of the Sorrell murders evidence admitted at the penalty phase of Gray's trial, the District Court concluded that the due process violation was not harmless. *Id.*, at 353. The District Court therefore vacated Gray's death sentence, and remanded the case to the state trial court for resentencing.

The Court of Appeals for the Fourth Circuit reversed. *Gray v. Thompson,* 58 F. 3d 59 (1995). It held that federal habeas relief was barred because Gray's due process claim depended on a "new rule" of constitutional law which, under *Teague v. Lane,* 489 U. S. 288 (1989), could not be applied on collateral review. The Court of Appeals accordingly remanded the case, directing the District Court to dismiss Gray's habeas petition.

## II

A case announces a "new rule" under *Teague* "if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.*, at 301 (plurality opinion). Gray's conviction became final in 1987, when we denied certiorari to review the Virginia Supreme Court's decision on direct appeal. See *Gray v. Virginia,* 484 U. S. 873 (1987). As explained below, precedent decided well before 1987 "dictates" the conclusion that Gray was not accorded due process at the penalty phase of his trial.

Gray's claim is encompassing, but it is fundamental. Under the Due Process Clause, he contends, a capital defendant must be afforded a meaningful opportunity to explain or deny the evidence introduced against him at sentencing. See Brief for Petitioner 45; Reply Brief for Petitioner 5.

---

that the claim had not been raised in state court, and therefore held it procedurally barred. 1 J. A. 194.

[9] After Gray's trial, the local prosecutor reportedly stated in an affidavit that Mr. Sorrell was no longer a suspect. See 2 *id.*, at 927 (news report in The Virginian-Pilot, Jan. 7, 1986, p. D1).

The District Court concluded that Gray was stripped of any meaningful opportunity to explain or deny the Sorrell murders evidence, for his lawyers were unfairly "ambushed"— clearly surprised and devastatingly disarmed by the prosecutor's decision, announced on the eve of the penalty trial, to introduce extensive evidence other than Gray's statements. App. 349–351. Gray's counsel reasonably relied on the prosecutor's unequivocal "statements only" pledge, see *id.*, at 342, made at the outset of trial; based on the prosecutor's assurances, defense counsel spent no resources tracking down information in police records on the Sorrell murders. The prosecutor's switch, altogether unanticipated by defense counsel, left them with no chance to uncover, through their own investigation, information that could have defused the prosecutor's case, in short, without time to prepare an effective defense. *Id.*, at 351.

The Fourth Circuit recast Gray's claim, transforming it into an assertion of a broad constitutional right to discovery in capital cases. See 58 F. 3d, at 64–65. This Court also restates and reshapes Gray's claim. The Court first slices Gray's whole claim into pieces; it then deals discretely with each segment it "perceive[s]," *ante*, at 162: a "misrepresentation" claim, *ante*, at 166; and a supposed "notice-of-evidence" claim, *ante*, at 166–170. Gray, himself, however, has "never claimed a constitutional right to advance discovery of the Commonwealth's evidence." Brief for Petitioner 46, n. 37, and accompanying text. His own claim is more basic and should not succumb to artificial endeavors to divide and conquer it.

There is nothing "new" in a rule that capital defendants must be afforded a meaningful opportunity to defend against the State's penalty phase evidence. As this Court affirmed more than a century ago: "Common justice requires that no man shall be condemned in his person or property without . . . an opportunity to make his defence." *Baldwin* v. *Hale*, 1 Wall. 223, 233 (1864). See also *Windsor* v. *McVeigh*, 93

U. S. 274, 277 (1876). A *pro forma* opportunity will not do.[10] Due process demands an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo*, 380 U. S. 545, 552 (1965); see *In re Oliver*, 333 U. S. 257, 275 (1948) (defendant must be afforded "a reasonable opportunity to meet [the charges against him] by way of defense or explanation"); *Morgan* v. *United States*, 304 U. S. 1, 18 (1938) ("The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them."). Absent a full, fair, potentially effective opportunity to defend against the State's charges, the right to a hearing would be "but a barren one." *Ibid.*; see *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 315 (1950) ("process which is a mere gesture is not due process").

In *Gardner* v. *Florida*, 430 U. S. 349 (1977), the principal decision relied on by the District Court, we confirmed that the sentencing phase of a capital trial "must satisfy the requirements of the Due Process Clause." *Id.*, at 358 (plurality opinion). *Gardner* presented the question whether a defendant was denied due process when the trial judge sentenced him to death relying in part on a presentence report, including a confidential portion not disclosed to defense counsel. Counsel's deprivation of an "opportunity . . . to challenge the accuracy or materiality" of the undisclosed information, *id.*, at 356, the *Gardner* plurality reasoned, left a manifest risk that "some of the information accepted in confidence may [have been] erroneous, or . . . misinterpreted,"

---

[10] Cf. *In re Gault*, 387 U. S. 1, 33 (1967) (notice to parents the night before a juvenile delinquency hearing was constitutionally inadequate; due process requires that notice "be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded"); *Powell* v. *Alabama*, 287 U. S. 45, 58 (1932) (defense counsel appointed the morning of trial could not satisfy the constitutional requirement because counsel lacked opportunity to investigate the case; Court observed that "[t]o decide otherwise, would simply be to ignore actualities").

*id.*, at 359. As a basis for a death sentence, *Gardner* teaches, information unexposed to adversary testing does not qualify as reliable. See *ibid.* The *Gardner* Court vacated the defendant's sentence, concluding that he "was denied due process of law when the death [penalty] was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Id.*, at 362.

Urging that *Gardner* fails to "dictate" a decision for Gray here, the Commonwealth relies on the Fourth Circuit's reasoning to this effect: *Gardner* was a case about "secrecy"; Gray's case is about "surprise." See 58 F. 3d, at 65. Therefore, Gray seeks an extension, not an application, of *Gardner*, see Brief for Respondent 30, in *Teague* parlance, a "new rule," Brief for Respondent 31. It would be an impermissible "leap," the Fourth Circuit maintained, to equate to a failure to disclose, a disclosure in fact made, "but allegedly so late as to be unfair." 58 F. 3d, at 65.

*Teague* is not the straitjacket the Commonwealth misunderstands it to be. *Teague* requires federal courts to decide a habeas petitioner's constitutional claims according to the "law prevailing at the time [his] conviction became final." 489 U. S., at 306 (plurality opinion) (internal quotation marks omitted). But *Teague* does *not* bar federal habeas courts from applying, in "a myriad of factual contexts," law that is settled—here, the right to a meaningful chance to defend against or explain charges pressed by the State. See *Wright* v. *West*, 505 U. S. 277, 309 (1992) (KENNEDY, J., concurring in judgment) ("Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.").

The District Court did not "forg[e] a new rule," *ibid.*, by holding, on the facts of this case, that Gray was denied a meaningful opportunity to challenge the Sorrell murders evidence. Ordinarily, it is incumbent upon defense counsel,

after receiving adequate notice of the triable issues, to pursue whatever investigation is needed to rebut relevant evidence the State may introduce. Here, however, in keeping with the practice approved by Virginia's highest court, see *supra*, at 172, and n. 1, the prosecutor expressly delineated the scope and character of the evidence he would introduce with respect to the Sorrell murders: nothing other than statements Gray himself allegedly made, see *supra*, at 173. Gray's lawyers reasonably relied on the prosecutor's "statements only" assurance by forgoing inquiry into the details of the Sorrell crimes. Resource-consuming investigation, they responsibly determined, was unnecessary to cast doubt on the veracity of inmate "snitch" testimony, the only evidence the prosecutor initially said he would offer.

Gray's lawyers were undeniably caught short by the prosecutor's startling announcement, the night before the penalty phase was to begin, that he would in effect put on a "minitrial" of the Sorrell murders. At that point, Gray's lawyers could not possibly conduct the investigation and preparation necessary to counter the prosecutor's newly announced evidence. Thus, at the penalty trial, defense counsel were reduced nearly to the role of spectators. Lacking proof, later uncovered, that "strongly suggested" Timothy Sorrell, not Gray, was the actual killer, App. 350–351, Gray's lawyers could mount only a feeble cross-examination of Detective Slezak; counsel simply inquired of the detective whether highly publicized crimes could prompt "copycat" crimes, see *id.*, at 37–40. Gray's lawyers had no questions at all for Doctor Presswalla, the medical examiner who testified about the Sorrell autopsies. *Id.*, at 47.[11]

---

[11] The Court attaches weight to the failure of Gray's lawyers to ask explicitly for deferral of the penalty phase. See *ante*, at 167, 169. It is uncontested that defense counsel made no formal motion for a continuance. But as the District Court described the morning-of-trial episode, counsel "plea[ded] for additional time to prepare." App. 343. And as earlier noted, see *supra*, at 174–175, counsel was explicit about the dilemma con-

In sum, the record shows, beyond genuine debate, that Gray was not afforded a "meaningful" opportunity to defend against the additional Sorrell murders evidence. The fatal infection present in *Gardner* infects this case as well: Defense counsel were effectively deprived of an opportunity to challenge the "accuracy or materiality" of information relied on in imposing the death sentence. *Gardner*, 430 U. S., at 356. Unexposed to adversary testing, the Sorrell murders evidence "carrie[d] no assurance of reliability." App. 351. The "debate between adversaries," valued in our system of justice for its contribution "to the truth-seeking function of trials," *Gardner*, 430 U. S., at 360, was precluded here by the prosecutor's eve-of-sentencing shift, and the trial court's tolerance of it. To hold otherwise "would simply be to ignore actualities." *Powell* v. *Alabama*, 287 U. S. 45, 58 (1932).[12]

---

fronting the defense: "We are not prepared to try the Sorrell murder today." 4 J. A. 2065. The Court's suggestion that "this plea [was] insufficient to have legal effect in court," *ante*, at 167, n. 4, is puzzling. Neither the Court, the Fourth Circuit, nor the Commonwealth has cited any Virginia authority for this proposition. Cf. *Smith* v. *Estelle*, 602 F. 2d 694, 701, n. 8 (CA5 1979) ("the state points us to no rule of Texas law saying that moving for a continuance is the only way to object to surprise"), aff'd on other grounds, 451 U. S. 454 (1981). Given the potency of the evidence in question, it is difficult to comprehend the Court's speculation that defense counsel, for "tactical" reasons, may have wanted only exclusion and not more time. Compare *ante*, at 169, with Tr. of Oral Arg. 11 (counsel for petitioner urged that if a trial judge is asked, "please stop this from happening . . . , it violates my [client's] right to a fair trial," the existence of that right should not turn on whether counsel next says, "please exclude this evidence, as opposed to please give me more time").

[12] *Weatherford* v. *Bursey*, 429 U. S. 545 (1977), featured by the Court, see *ante*, at 168, 169–170, hardly controls this case. There, the State's *witness*, and not the prosecutor, misled defense counsel. 429 U. S., at 560. Furthermore, *Weatherford* did not involve the penalty phase of a capital trial, a stage at which reliability concerns are most vital. Finally, the defendant in *Weatherford* did not object at trial to the surprise witness, and did not later show how he was prejudiced by the surprise. *Id.*, at 561.

\* \* \*

For the reasons stated, I conclude that the District Court's decision vacating Gray's death sentence did not rest on a "new rule" of constitutional law. I would therefore reverse the judgment of the Court of Appeals, and respectfully dissent from this Court's decision.