By unpublished order filed 6/13/00, this case -- on remand from the U.S. Supreme Court -- is remanded to the district court.

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

TERRY WILLIAMS,
Petitioner-Appellee,

v.

No. 98-14

JOHN TAYLOR, Warden, Sussex I
State Prison,
Respondent-Appellant.

TERRY WILLIAMS,
Petitioner-Appellant,

v.

No. 98-16

JOHN TAYLOR, Warden, Sussex I
State Prison,
Respondent-Appellee.

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-97-1527-A)

Argued: September 24, 1998

Decided: December 18, 1998

Before WIDENER, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Williams wrote the opinion, in which Judge Widener and Judge
Michael joined.

_____

**COUNSEL**

**ARGUED:** Robert Quentin Harris, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Ellen O. Boardman, O'DONOGHUE & O'DONOGHUE, Washington, D.C., for Appellee. **ON BRIEF:** Mark L. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Brian A. Powers, Dinah S. Leventhal, O'DONOGHUE & O'DONOGHUE, Washington, D.C., for Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

On September 30, 1986, a Virginia jury convicted Terry Williams of the capital murder of Harris Thomas Stone. Following the jury's determination that Williams presented a future danger to society, the trial court sentenced Williams to death. After exhausting all available state remedies, Williams petitioned the United States District Court for the Eastern District of Virginia for habeas corpus relief. See 28 U.S.C.A. § 2254 (West Supp. 1998). The district court ordered that the writ be granted on the ground that Williams's trial counsel were ineffective because they failed to present certain evidence in mitigation of punishment during the sentencing phase of Williams's trial. The remaining allegations in Williams's habeas petition were dismissed.

On appeal, the Commonwealth contends that the writ was erroneously granted.[1] We agree. The Virginia Supreme Court's conclusion

_____

[1] Williams named Sam Pruett, Warden of the Mecklenburg Correctional Center, as Respondent in his petition. When Fred W. Greene replaced Pruett as Warden, Greene was substituted for Pruett as Respondent. Thereafter, Williams was transferred to the Sussex I State Prison. As a result, John Taylor, Warden of the Sussex I State Prison, was substituted for Greene as Respondent. Because of the numerous changes, we refer to Respondent as "the Commonwealth" throughout this opinion.

2

that Williams's trial counsel were not ineffective during the sentencing phase of Williams's trial was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. As a result, Williams is not entitled to habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). **2** <u>See</u> 28 U.S.C.A. § 2254(d) (West Supp. 1998). Moreover, we conclude that none of the claims raised in Williams's cross-appeal provide a basis for federal habeas relief. Accordingly, we affirm in part and reverse in part.

I.

As recited by the Virginia Supreme Court, the undisputed facts are as follows:

> Stone, an elderly man who resided on Henry Street in Danville, was found dead in his bed shortly before 2:00 a.m. Sunday, November 3, 1985. There was no sign of a struggle, no blood was observed on Stone's body, and he was fully clothed. Despite a diligent search, Stone's wallet, which he customarily kept fastened in the back pocket of his pants, was never found.
>
> The local medical examiner, who examined the body [at] about 9:30 that Sunday morning, noted an abrasion on the chest, but no bruising. Stone's history of heart disease and the police failure to report anything suspicious about the circumstances of Stone's death led the local medical examiner to conclude that Stone's death was due to heart failure. However, when Stone's blood alcohol content was later ana-

_____

**2** Williams filed his petition for a writ of habeas corpus on December 12, 1997, more than one year after the enactment of the AEDPA. <u>See</u> Pub. L. No. 104-132, 110 Stat. 1214 (enacted on April 24, 1996). As a result, § 104 of the AEDPA, which amended 28 U.S.C.A. § 2254(d) (West Supp. 1998), applies to this appeal. <u>See Lindh v. Murphy</u>, 117 S. Ct. 2059, 2067-68 (1997) (holding that the new habeas standards of review do not apply to habeas petitions pending in federal court prior to the enactment of the AEDPA); <u>Green v. French </u>, 143 F.3d 865, 868 (4th Cir. 1998) (applying AEDPA to capital habeas petition filed after the enactment of the AEDPA).

3

lyzed and was reported to be 0.41%, the regional medical examiner's office in Roanoke amended the finding of the cause of death to alcohol poisoning. Stone's daughter testified Stone looked "a little high" when she last saw him entering his house shortly after 6:00 p.m. on Saturday, November 2, 1985.

When the funeral director, Jack Miller, observed Stone's body on Monday morning, he called a bruise or abrasion over the left ribs to the attention of the police. The police told Miller that the local medical examiner believed the bruise was an old one. Though Miller disagreed with the local medical examiner, on instructions from the police he embalmed the body.

Almost six months later, the chief of police in Danville received an anonymous letter from an inmate of the local jail in which the author admitted killing "that man Who Die on Henry St." The police interviewed Williams, an inmate of the Danville jail at the time, who eventually admitted that he had written the letter and later gave multiple confessions to the murder and robbery of Stone. Williams said he had first struck Stone in the chest, and later on his back, with a mattock and had removed three dollars from Stone's wallet.

Stone's body was exhumed. On July 2, 1986 Dr. David Oxley, a forensic pathologist and Deputy Chief Medical Examiner for Western Virginia, performed an autopsy. When Dr. Oxley opened the body, he found Stone's fourth and fifth ribs on the left side had been fractured and displaced inward, puncturing the left lung and depositing a quantity of blood in the left chest cavity.

Williams v. Commonwealth, 360 S.E.2d 361, 363-64 (Va. 1987).

After a jury trial in the Circuit Court of the City of Danville, Virginia, Williams was convicted of the capital murder of Mr. Stone. Based on its finding of future dangerousness, see Va. Code Ann. § 19.2-264.4(c) (Michie Supp. 1998), the jury recommended that Williams be sentenced to death. Following the jury's recommendation,

4

the trial court sentenced Williams to death. On direct appeal, the Virginia Supreme Court affirmed Williams's conviction and death sentence. See Williams, 360 S.E.2d at 363-64. The United States Supreme Court denied Williams's petition for a writ of certiorari. See Williams v. Virginia, 484 U.S. 1020 (1988).

Williams filed a habeas corpus petition in the Danville Circuit Court on August 26, 1988. After a hearing, the Danville Circuit Court dismissed the majority of Williams's claims. Almost seven years later, Williams amended his habeas petition to include several claims that his trial counsel were ineffective. In June 1995, the Danville Circuit Court held an evidentiary hearing on the issue of ineffective assistance of trial counsel.

Prior to any action on the hearing, however, jurisdiction over the habeas petition was transferred to the Virginia Supreme Court. See Va. Code Ann. § 8.01-654(C)(1) (Michie Supp. 1998) (providing that the Virginia Supreme Court has "exclusive jurisdiction" to consider writs of habeas corpus with respect to prisoners under a death sentence). By order dated May 6, 1996, the Virginia Supreme Court directed the Danville Circuit Court to report its findings of fact and conclusions of law relating to the ineffective assistance of counsel claims addressed at the June 1995 evidentiary hearing. See id. (providing that the circuit court that entered the sentence of death may conduct an evidentiary hearing "only if directed to do so by order of the Supreme Court").

On August 15, 1996, the Danville Circuit Court forwarded its Findings of Fact and Recommended Conclusions of Law (the Report) to the Virginia Supreme Court. The Danville Circuit Court found that trial counsel's "performance at the guilt phase of the trial was both professional and competent." (J.A. at 1055.) Of particular importance here, the Danville Circuit Court concluded that trial counsel properly handled the court-appointed mental health experts, and that lead trial counsel, E.L. Motley, was not suffering from a mental impairment during the course of his representation of Williams.

The Danville Circuit Court did conclude, however, that trial counsel's failure to present certain mitigating evidence during the sentencing phase of the trial warranted relief. Specifically, the Danville

5

Circuit Court found that trial counsel failed to investigate and present (1) Williams's juvenile commitment records from the Beaumont Correctional Center, (2) records, including statements from Williams's siblings, that provided a summary of Williams's early home life, (3) the testimony of Williams's estranged wife and eleven-year-old daughter, and (4) the testimony of Williams's friend Bruce Elliot. According to the Report, had this evidence been developed and presented at the sentencing phase of Williams's trial, the jury would have learned that Williams "had a deprived and abused upbringing; that he may have been a neglected and mistreated child; that he came from an alcoholic family; and that he was borderline mentally retarded." (J.A. at 1059-60.) Continuing, the Report stated that the evidence in question would have shown that Williams's "conduct had been good in certain structured settings in his life (such as when he was incarcerated) and . . . that he had redeeming qualities." (J.A. at 1060.) In summary, the Danville Circuit Court found that the mitigating evidence probably would have been given weight by at least one member of the jury. Because one juror would have been the difference between life and death, the Report ultimately concluded that Williams was prejudiced by trial counsel's failure to make use of the mitigating evidence.

Both the Commonwealth and Williams filed objections to the Report. The Commonwealth argued that trial counsel were not ineffective during the sentencing phase of Williams's trial for making a tactical decision not to introduce evidence that was just as likely to operate to Williams's disadvantage. Williams, in contrast, argued that the Danville Circuit Court erred in finding that his trial counsel were effective during the guilt phase of his trial. On January 13, 1997, the Virginia Supreme Court ordered briefing and argument on the one issue that the Danville Circuit Court found warranted relief, and adopted the Danville Circuit Court's recommendation that the other claims be dismissed.

On June 6, 1997, the Virginia Supreme Court unanimously rejected the Danville Circuit Court's finding that trial counsel's failure to present certain mitigating evidence during the sentencing phase warranted relief. See Williams v. Warden, 487 S.E.2d 194 (Va. 1997). In so holding, the Virginia Supreme Court reviewed Williams's ineffective assistance of counsel claim under Strickland v. Washington, 466 U.S. 668 (1984), and, to a lesser extent, Lockhart v. Fretwell, 506

6

U.S. 364 (1993). After assuming that Williams's trial counsel's performance was deficient, the Virginia Supreme Court concluded that Williams failed to demonstrate prejudice.

On December 12, 1997, Williams filed a habeas corpus petition pursuant to 28 U.S.C.A. § 2254 in the United States District Court for the Eastern District of Virginia. In his petition Williams argued, among other things, that his counsel were ineffective in several respects. On April 7, 1998, the district court ordered that the writ be granted on the ground that Williams's trial counsel were ineffective for failing to present evidence in mitigation of punishment during the sentencing phase of Williams's trial. In so ruling, the district court specifically concluded that the Virginia Supreme Court's application of Strickland and Lockhart was unreasonable. The remaining allegations in Williams's habeas petition were dismissed.

On appeal, the Commonwealth contends that the district court erred in granting Williams federal habeas relief. In particular, the Commonwealth argues that the Virginia Supreme Court's conclusion that Williams's trial counsel were not ineffective was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. In his cross-appeal, Williams contends: (1) that his lead trial counsel's mental illness rendered his assistance constitutionally ineffective, and (2) that his trial counsel's failure to handle properly several matters related to his court-appointed mental health experts rendered their assistance constitutionally ineffective. We address the Commonwealth's and Williams's arguments in turn.

II.

Before we address the merits of either the Commonwealth's appeal or Williams's cross-appeal, we must first determine the applicable standard of review. The Antiterrorism and Effective Death Penalty Act of 1996 provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

7

> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United
> States; or

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State court proceeding.

28 U.S.C.A. § 2254(d) (West Supp. 1998). We recently interpreted subsection (1) to prohibit the issuance of the writ unless (a) the state court decision is in "square conflict" with Supreme Court precedent that is controlling as to law and fact or (b) if no such controlling decision exists, "the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant [S]upreme [C]ourt precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts." Green v. French, 143 F.3d 865, 870 (4th Cir. 1998). "In other words, habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." Id.

Williams contends, however, that we erroneously construed § 2254 in Green v. French.[3] Thus, Williams argues that the standard of review adopted in that case should not be followed here. This argument need not detain us long. "It is well established that a decision of this Court is binding on other panels unless it is overruled by a subsequent en banc opinion of the Court or an intervening decision of the United States Supreme Court." Smith v. Moore , 137 F.3d 808, 821 (4th Cir.) (citing Industrial Turnaround Corp. v. NLRB, 115 F.3d 248, 254 (4th Cir. 1997)), cert. denied, 119 S. Ct. 199 (1998). Neither the

_____

**3** Williams also contends, albeit in a cursory fashion, that the Green v. French standard of review violates both the Suspension Clause and Article III of the Constitution. To the extent these claims are properly before us, see Canady v. Crestar Mortgage Corp., 109 F.3d 969, 973 (4th Cir. 1997) (holding that issues not fully briefed are deemed waived on appeal), the identical claims were raised and rejected in Green v. French, 143 F.3d 865, 874-76 (4th Cir. 1998).

en banc Court nor the United States Supreme Court has overruled (or even called into question) the standard of review adopted by this Court in Green v. French. Indeed, since Green v. French was decided, we have applied the new standard in Fitzgerald v. Greene, 150 F.3d 357, 362 (4th Cir. 1998), Wright v. Angelone, 151 F.3d 151, 156 (4th Cir. 1998), and Cardwell v. Greene, 152 F.3d 331, 339 (4th Cir. 1998). As a consequence, the standard of review enunciated in Green v. French continues to be the binding law of this Circuit.

III.

Although the Virginia Supreme Court unanimously found that Williams's trial counsel were not ineffective, see Williams v. Warden, 487 S.E.2d 194, 200 (Va. 1997), the district court concluded that the Virginia Supreme Court unreasonably applied Strickland v. Washington, 466 U.S. 668 (1984), and Lockhart v. Fretwell, 506 U.S. 364 (1993), in finding no prejudice. In addition, the district court found that the Virginia Supreme Court "made an error of fact in discussing its finding of no prejudice." (J.A. at 1102.) Finding that Williams's trial counsel were constitutionally ineffective for failing to investigate, prepare, and present certain evidence in mitigation of punishment during the sentencing phase of Williams's trial, the district court ordered that the writ be granted.**4** In contrast to the district court, we conclude that the Virginia Supreme Court's finding of no prejudice was neither based on an unreasonable application of the tests set forth by the United States Supreme Court in Strickland and Lockhart for determining prejudice, nor based on an unreasonable determination of the facts in light of the evidence presented at the evidentiary hearing held by the Danville Circuit Court.

_____

**4** The district court identified the same allegedly mitigating evidence cited by the Danville Circuit Court: (1) Williams's juvenile commitment records from the Beaumont Correctional Center, (2) records, including statements from Williams's siblings, that provided a summary of Williams's early home life, (3) the testimony of Williams's estranged wife and eleven-year-old daughter, and (4) the testimony of Williams's friend Bruce Elliot. In addition, the district court identified Williams's prison commendations for returning a guard's wallet and for identifying members of a prison drug gang. The Danville Circuit Court attached no significance to Williams's prison commendations.

9

A.

In Strickland, the Supreme Court established a two-part test for reviewing claims of ineffective assistance of counsel. See Strickland, 466 U.S. at 690. First, Williams must demonstrate that his trial counsel's performance fell below an objective standard of reasonableness. See id. at 687-91. This, however, is no simple task. A court's review of counsel's performance is "highly deferential." Id. at 689. Indeed, courts must afford a strong presumption that counsel's performance was within the wide range of professionally competent assistance. See id. If Williams is able to demonstrate that his trial counsel's performances were objectively unreasonable, he must then "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. As a result, Williams's trial counsel may be deemed ineffective only if their "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686.

In Lockhart, the Supreme Court clarified the meaning of prejudice under Strickland. See Lockhart, 506 U.S. at 369-70. Although the Supreme Court in Strickland focused primarily on whether "the result of the proceeding would have been different," Strickland, 466 U.S. at 694, the Supreme Court in Lockhart clarified that "an analysis focusing solely on mere outcome determination . . . is defective," Lockhart, 506 U.S. at 369. Instead, a proper prejudice analysis must consider "whether the result of the proceeding was fundamentally unfair or unreliable." Id. As a result, a court may not "set aside a conviction or sentence solely because the outcome would have been different but for counsel's error." Id. at 369-70.

The Virginia Supreme Court assumed, without deciding, that Williams's trial counsel's performance fell below an objective standard of reasonableness. See Williams v. Warden, 487 S.E.2d 194, 198 (Va. 1997) (concluding that it was "easier to dispose of [Williams's] ineffectiveness claim on the ground of lack of sufficient prejudice"). The district court, however, concluded that Williams's trial counsel were, in fact, deficient. Like the Virginia Supreme Court, we will assume, without deciding, that Williams's trial counsel were objectively unreasonable in failing to investigate, prepare, and present certain evi-

10

dence in mitigation of punishment during the sentencing phase of Williams's trial. Despite assuming that Williams's trial counsel were objectively unreasonable in failing to introduce the evidence in question, we cannot say that the Virginia Supreme Court's decision that Williams was not prejudiced thereby was an unreasonable application of the tests developed in either Strickland or Lockhart for determining prejudice. The Virginia Supreme Court's analysis on this point is as follows:

> [Williams's argument] flies in the face of the Supreme Court's admonition in Lockhart, [506 U.S. at 364], that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."

> We shall demonstrate that the criminal proceeding sentencing defendant to death was not fundamentally unfair or unreliable, and that the prisoner's assertions about the potential effects of the omitted proof do not establish a "reasonable probability" that the result of the proceeding would have been different, nor any probability sufficient to undermine confidence in the outcome. Therefore, any ineffective assistance of counsel did not result in actual prejudice to the accused. The jury was presented with the murder of an intoxicated, elderly person in his own bedroom committed by a 31-year-old man. The murder weapon was a tool customarily used to dig stumps. At the time, defendant had been out of the penitentiary for only seven months, released on parole for convictions of burglary and grand larceny.

> The accused was in the midst of a crime spree, preying upon defenseless individuals. Following commission of these crimes of murder and robbery in November 1985, the defendant savagely beat an elderly woman about her head in March 1986, leaving her lying in the street unconscious with multiple injuries. At the time of trial, she was in a nursing home "vegetating" from a brain injury with no hope of recovery.

> Upon being questioned in April and May 1986 about the November 1985 crimes, the defendant admitted to the recent

11

theft of two motor vehicles. He also admitted setting fire to clothes on the porch of a residence late one night in December 1985, luring the occupant outside, and stabbing him with a knife in order to rob him. The accused later was convicted of the vehicle thefts and, at the time of trial for the present crimes, had been convicted of an arson that took place in the city jail.

While held in jail on the present offenses, he related to a police officer "that he wanted to just choke some of the guys in the jail cell, and one day some had gone to the library and one guy was laying on the bed, and he got the urge to just go over and choke him. Another time he was playing cards and he thought he could just hit someone and break that person's jaw without him ever knowing what hit him."

The jury also heard that defendant had served time in the penitentiary for an armed robbery committed when he was about 20 years old. The jury did not know of 14 criminal offenses committed by defendant from 1966 to 1975.

Drawing on Strickland, we hold that, even assuming the challenged conduct of counsel was unreasonable, the prisoner "suffered insufficient prejudice to warrant setting aside his death sentence," 466 U.S. at 698-99, the predicate of which was that there is a probability that he would commit criminal acts of violence which would constitute a continuing serious threat to society. The mitigation evidence that the prisoner says, in retrospect, his trial counsel should have discovered and offered barely would have altered the profile of this defendant that was presented to the jury. At most, this evidence would have shown that numerous people, mostly relatives, thought that defendant was nonviolent and could cope very well in a structured environment. Of course, those assumptions are belied by the four-month crime spree beginning with the present crimes and by the defendant's current attitude while in jail toward other inmates.

What the Supreme Court said in Strickland applies with full force here: "Given the overwhelming aggravating fac-

12

tors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." 466 U.S. at 700. Indeed, disclosure of the defendant's juvenile history might even have been harmful to his case.

Williams v. Warden, 487 S.E.2d 194, 199-200 (Va. 1997).

According to the district court, the Virginia Supreme Court's application of the Strickland prejudice standard was unreasonable because there was a reasonable probability that at least one juror would have concluded that the death penalty was not warranted had the evidence in question been presented. (J.A. at 1099 (noting that Va. Code Ann. § 19.2-264.4(E) provides that a death sentence must be unanimous).) For the reasons that follow, we disagree.

To the extent the district court suggests that a capital defendant faces a less rigorous standard for determining prejudice than a non-capital defendant, it is simply mistaken. A court may not assume that one juror may be more likely swayed by mitigating evidence than his fellow jurors. See Strickland, 466 U.S. at 695 (noting that a finding of prejudice does not "depend on the idiosyncrasies of the particular decision maker, such as unusual propensities toward harshness or leniency"). Rather, the Strickland prejudice standard assumes twelve reasonable, conscientious, and impartial jurors. Thus, that one hypothetical juror might be swayed by a particular piece of evidence is insufficient to establish prejudice.

Like the Virginia Supreme Court, we readily conclude that Williams was not prejudiced in any way by counsel's actions. Evidence that Williams presented a future danger to society was simply overwhelming. The murder of Mr. Stone was just one act in a crime spree that lasted most of Williams's life. Indeed, the jury heard evidence that, in the months following the murder of Mr. Stone, Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw. Because a significant portion of the allegedly mitigating evidence also painted Williams as a recidivist who was likely to

13

commit future offenses, the Virginia Supreme Court's conclusion that there was not "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694, was not unreasonable.

The district court also concluded that the Virginia Supreme Court's application of Lockhart was unreasonable. Specifically, the district court held that the prejudice standard developed in Lockhart applies only in "`the unusual circumstance where the defendant attempts to demonstrate prejudice based on considerations that, as a matter of law, ought not to inform the inquiry.'" (J.A. at 1101 (quoting Lockhart, 506 U.S. at 373 (O'Connor, J., concurring)).) Because Williams sought to demonstrate prejudice based on trial counsel's failure to present mitigating evidence, which, by current law, Williams was entitled to put before the sentencing jury, the district court determined that the standard developed in Lockhart was inapplicable.

The district court, we believe, construed Lockhart far too narrowly. Although Justice O'Connor would limit the prejudice analysis contained in Lockhart to the "unusual" case, Chief Justice Rehnquist, writing for the majority, made no such disclaimer. Indeed, as the Lockhart majority made clear, the requirement that a criminal defendant alleging prejudice show that the result of the proceeding was unfair or unreliable was the rule, not the exception. See Lockhart, 506 U.S. at 369. In fact, the Supreme Court in Strickland concluded its analysis by noting that the defendant "made no showing that . . . his sentence was rendered unreliable," or that his "sentencing proceeding was . . . fundamentally unfair." Strickland , 466 U.S. at 700. Thus, Lockhart's emphasis on reliability and a fair trial simply clarified the meaning of prejudice under Strickland. Accord United States v. Prince, 110 F.3d 921, 925 (2d Cir.) (noting that "`analysis focusing solely on mere outcome determination . . . is defective'" (quoting Lockhart, 506 U.S. at 368)), cert. denied , 118 S. Ct. 188 (1997); McQueen v. Scroggy, 99 F.3d 1302, 1311 (6th Cir. 1996) (stating that the Supreme Court in Lockhart clarified the meaning of prejudice), cert. denied, 117 S. Ct. 2422 (1997); Hayes v. Alabama, 85 F.3d 1492, 1496 (11th Cir. 1996) (stating that prejudice requires a showing that counsel's errors deprived the defendant of a fair trial), cert. denied, 117 S. Ct. 1262 (1997); United States v. Kissick, 69 F.3d 1048, 1055 (10th Cir. 1995) (noting that a criminal defendant must

14

demonstrate that counsel's performance rendered the proceeding "fundamentally unfair or unreliable" to show prejudice); Flamer v. Delaware, 68 F.3d 710, 728 (3d Cir. 1995) (noting that Lockhart's fundamentally unfair or unreliable standard "clarified the meaning of prejudice under Strickland").

In sum, the district court erred in construing Lockhart based solely on Justice O'Connor's concurring opinion. The holding in Lockhart -- that a criminal defendant must show that counsel's performance rendered the proceeding fundamentally unfair or unreliable to establish prejudice -- is not limited to the "unusual" case. Indeed, the standard for prejudice set forth in Lockhart is not an exception to the Strickland standard, but rather a clarification. We note that the Virginia Supreme Court's application of Lockhart was consistent with how our sister circuits have applied the decision, and we cannot say that the Virginia Supreme Court's reliance on Lockhart, in addition to Strickland, rendered its ineffective assistance of counsel analysis unreasonable under § 2254(d).

Finally, Williams contends that the Virginia Supreme Court erroneously applied a "weighing" analysis from Strickland in finding no prejudice. Williams's argument is based on the following passage from the Virginia Supreme Court's opinion:

> What the Supreme Court said in Strickland applies with full force here: "Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed."

Williams, 487 S.E.2d at 200 (quoting Strickland, 466 U.S. at 700). For the reasons that follow, we conclude that the Virginia Supreme Court reasonably applied "clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C.A. § 2254(d)(1), in rejecting Williams's ineffective assistance of counsel claims.

When a death sentence is supported by an invalid aggravating factor, whether the sentence of death may stand turns on whether the jury was required to "weigh" the aggravating circumstances against the

15

mitigating circumstances. See Stringer v. Black , 503 U.S. 222, 232 (1992) (noting that in a nonweighing state the jury's reliance on an invalid aggravating factor may not "infect the formal process of deciding whether death is an appropriate penalty so long as the sentencing body finds at least one valid aggravating factor"). As a result, the term "weighing state" has become a term of art in capital cases. See Clemons v. Mississippi, 494 U.S. 738, 752 (1990). Florida, for example, is a weighing state, see Parker v. Dugger, 498 U.S. 308, 318 (1991), while Virginia is not, see Tuggle v. Netherland, 79 F.3d 1386, 1389 (4th Cir.), cert. denied, 117 S. Ct. 237 (1996). Because Strickland involved a Florida defendant, Williams argues that only in a "weighing state" may prejudice be determined by considering whether the aggravating evidence outweighed the mitigating evidence. We find this argument to be without merit.

First, there is no evidence that any portion of the Supreme Court's prejudice analysis in Strickland was meant to apply only to "weighing states," like Florida. Rather, we believe that the Supreme Court used the term "outweighed" in its ordinary sense. Indeed, the term "weighing" did not become a term of art until six years after Strickland was decided. See Clemons, 494 U.S. at 738 (applying "weighing" as term of art in 1990). Second, this Court used the identical quotation from Strickland in rejecting a South Carolina defendant's claim of prejudice in a capital case, see Plath v. Moore, 130 F.3d 595, 602 (4th Cir. 1997), cert. denied, 118 S. Ct. 1854 (1998), and South Carolina, like Virginia, is not a weighing state, see Smith v. Moore, 137 F.3d 808, 815 (4th Cir.), cert. denied, 119 S. Ct. 199 (1998). In fact, this Court recently used the identical quotation from Strickland in rejecting a Virginia defendant's claim of prejudice in a capital case. See Fitzgerald v. Greene, 150 F.3d 357, 368 (4th Cir. 1998) (noting that "[i]n the context of challenging a death sentence, `the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death'" (quoting Strickland, 466 U.S. at 695)). Based upon the foregoing, we cannot say that the Supreme Court of Virginia's rejection of Williams's claim was an unreasonable application of Strickland.

B.

The district court also concluded that the Virginia Supreme Court "made an error of fact in discussing its finding of no prejudice." (J.A.

16

at 1102.) Specifically, the district court took exception with the Virginia Supreme Court's characterization of the allegedly mitigating evidence as "mostly relatives, [who] thought the defendant was nonviolent and could cope well in a structured environment." Williams, 487 S.E.2d at 200. The district court criticized the Virginia Supreme Court for failing to mention the possible testimony of Williams's friend Bruce Elliot and several state correctional officers, and for overlooking evidence dealing with Williams's difficult childhood and limited mental capacity.

Despite the contentions of the district court to the contrary, the Virginia Supreme Court accurately described the omitted mitigation evidence that was credited by the Danville Circuit Court after the two-day evidentiary hearing. The Danville Circuit Court only identified Williams's estranged wife, daughter, siblings, mother, and friend Bruce Elliot as possible witnesses whose testimony"was worthy of a jury's consideration." (J.A. at 1060.) Thus, the Virginia Supreme Court's description of the witnesses as "mostly family members" was reasonable.[5] Moreover, the Virginia Supreme Court's description of the nature of their testimony was also reasonable. The affidavits of Williams's family members attempt to portray him as nonviolent. Similarly, Williams's friend Bruce Elliot described Williams as nonviolent, proud of his accomplishments, and able to thrive in a structured environment. Because the Virginia Supreme Court's decision was not based on an unreasonable determination of the facts in light of the evidence presented at the evidentiary hearing held by the Danville Circuit Court, the district court erred in granting the writ. See 28 U.S.C.A. § 2254(d)(2) (West Supp. 1998).

_____

**5** In an effort to prove that the witnesses who could have testified at Williams's sentencing hearing were not "mostly relatives," counsel for Williams provided this Court, pursuant to Local Rule 28(f) and Fed. R. App. P. 28(j), with the names of fifteen potential witnesses, only seven of whom were relatives of Williams. Despite counsel's efforts, we note that the Danville Circuit Court identified (at most) six omitted witnesses, only one of whom was not a relative. The overwhelming majority of nonrelative witnesses listed by counsel were never identified, much less credited, by the Danville Circuit Court. Accordingly, it comes as no surprise that the Virginia Supreme Court failed to consider those witnesses.

17

IV.

In his cross-appeal, Williams contends that his trial counsel were ineffective in several respects. First, Williams argues that his lead trial counsel was mentally ill. Second, Williams argues that his trial counsel mishandled several matters related to his court-appointed mental health experts. We address these arguments in turn.

A.

Almost one year after Williams's trial, his lead trial counsel, E.L. Motley, Jr., was diagnosed with depression. Soon thereafter, Motley's depression rendered him incapable of practicing law. In fact, after a series of complaints to the Virginia Bar, Motley was forced to surrender his license. In his habeas petition, Williams contends that his Sixth Amendment right to effective assistance of counsel was violated because Motley was mentally impaired during his trial.

It is well established that the Sixth Amendment right to counsel "cannot be satisfied by mere formal appointment." Avery v. Alabama, 308 U.S. 444, 446 (1940). Rather, the Sixth Amendment guarantees criminal defendants the assistance of "a reasonably competent attorney." McMann v. Richardson, 397 U.S. 759, 770-71 n.14 (1970). As a consequence, an attorney's mental incapacity may violate his client's Sixth Amendment right to counsel. Here, however, the Danville Circuit Court specifically found, after a two-day evidentiary hearing, that Motley was not acting under a mental or emotional disability during Williams's trial:

> Petitioner alleges that he was denied his Sixth Amendment right to counsel because E.L. Motley, Jr.[,] was mentally impaired and unable to effectively represent him in the preparation, trial and appeal of his complex, capital murder case. This court has heard evidence relating to this claim, but finds that Motley was not acting under a mental or emotional disability during the course of his representation of Williams. Specifically Motley did not begin to have problems related to his depression until the late spring or early summer of 1987. Williams' case was tried in 1986. His brief on direct appeal was filed in March, 1987. The opinion of

18

the Supreme Court of Virginia was issued in September, 1987.

It is clear that what problems Motley did have thereafter did not manifest themselves during the trial of this case. Motley prioritized his work by placing the criminal matters ahead of civil matters, and capital murder cases receiving the highest priority. Both Motley and Smitherman prepared the appellate brief, after being counsel in the trial of these cases.

During the two years that he knew Motley, Smitherman never noticed anything about Motley during the course of Williams' trial. Smitherman did not begin to notice a difference in Motley's behavior until 1988. Smitherman noticed no sign of any dysfunction in Motley during the time of their joint representation of Williams.

Based on the testimony at the evidentiary hearing, and on the personal observations of this Court during the course of the criminal trial, this Court finds that E.L. Motley was acting under no disability during the course of his representation of the petitioner. Furthermore, to the extent that any claim presented by the petitioner herein is based on the mental problems suffered by Mr. Motley, such claims lack merit.

In fact, at no time during the trial did Motley exhibit any conduct which would lead one to believe he was suffering from any disability.

(J.A. at 1022-24.) The Virginia Supreme Court adopted the Danville Circuit Court's finding and dismissed Williams's Sixth Amendment claim.

The finding that Motley's legal work was not adversely affected by his depression until after the conclusion of Williams's trial and appeal is entitled to a presumption of correctness in this federal habeas corpus proceeding. See 28 U.S.C.A. § 2254(e)(1) (West Supp. 1998). We cannot say that the Danville Circuit Court's findings, which were

19

adopted by the Virginia Supreme Court, are "an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C.A. § 2254(d)(2) (West Supp. 1998). As a result, Williams's claim is without merit and was properly dismissed by the district court.

B.

On July 10, 1986, Dr. Centor was appointed by the trial court to examine Williams after Williams's counsel intimated that he "may lack substantial capacity to understand the proceedings against him or to assist his attorney in his own defense." (J.A. at 1038.) Dr. Ryans, although not specifically appointed by the trial court, assisted Dr. Centor in evaluating Williams at the Central State Hospital. On August 13, 1986, Dr. Centor filed a report with the trial court that dealt solely with Williams's competency to plead. During the sentencing phase, Dr. Ryans and Dr. Centor were called by the Commonwealth as witnesses. Both doctors testified, based solely on Williams's criminal history, that Williams represented a future danger to society.

In his habeas petition Williams contends that his trial counsel mishandled several matters related to Dr. Ryans and Dr. Centor, the court-appointed mental health experts. Specifically, Williams asserts that trial counsel: (1) failed to object to the dual appointment of mental health experts, (2) failed to use the court-appointed experts in violation of Ake v. Oklahoma, 470 U.S. 68 (1985), (3) failed to bar the Commonwealth's use of the court-appointed experts, and (4) failed to rebut the court-appointed experts' damaging testimony.

1.

First, Williams claims that trial counsel were ineffective because they failed to object to the dual appointment of mental health experts. In response, the Commonwealth argues that the claim is procedurally defaulted because it was never presented to the Virginia state courts, and, in the alternative, is without merit. We agree with the Commonwealth that this claim was procedurally defaulted. As a result, we decline to address the merits.

20

"In the interest of giving state courts the first opportunity to consider alleged constitutional errors occurring in a defendant's state trial and sentencing," a state prisoner must "exhaust" all available state remedies before he can apply for federal habeas relief. <u>Matthews v. Evatt</u>, 105 F.3d 907, 910 (4th Cir.), <u>cert. denied</u>, 118 S. Ct. 102 (1997); <u>see also</u> 28 U.S.C.A. § 2254(b) (West Supp. 1998) (barring the granting of habeas corpus relief "unless it appears that the applicant has exhausted the remedies available in the courts of the State"); <u>Rose v. Lundy</u>, 455 U.S. 509, 518 (1982) ("The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state court proceedings."). To exhaust state remedies, a habeas petitioner must present the substance of his claim to the state's highest court. <u>See Anderson v. Harless</u>, 459 U.S. 4, 6 (1982) (per curiam); <u>Picard v. Connor</u>, 404 U.S. 270, 275-78 (1971); <u>Matthews</u>, 105 F.3d at 911. A procedural default occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." <u>Coleman v. Thompson</u>, 501 U.S. 722, 731-32 (1991).

It is undisputed that Williams failed to present the substance of this claim to the Virginia Supreme Court.**6** As a result, Williams failed to satisfy the exhaustion requirement. Moreover, if this claim was presented to the Virginia Supreme Court for the first time at this juncture, it would be procedurally barred pursuant to Va. Code Ann. § 8.01-654(B)(2) (Michie Supp. 1998). Under § 8.01-654(B)(2), "a petitioner is barred from raising any claim in a successive petition if the facts as to that claim were either known or available to petitioner at the time of his original petition." <u>Hoke v. Netherland</u>, 92 F.3d 1350, 1354 n.1 (4th Cir.) (internal quotation marks omitted), <u>cert. denied</u>, 117 S. Ct. 630 (1996); <u>see also</u> Va. Code Ann. § 8.01-654(B)(2) ("No writ [of habeas corpus] shall be granted on the basis of any allegation the facts of which petitioner had knowledge at the time of filing any previous petition."). Accordingly, we conclude that this claim is pro-

_____

**6** Williams does not contend that the facts underlying this claim were either unknown or unavailable to him at the time he filed his amended habeas corpus petition in the Danville Circuit Court.

cedurally defaulted. See Gray v. Netherland, 116 S. Ct. 2074, 2080-81 (1996).

We may excuse Williams's procedural default, however, if he can demonstrate either cause for and resulting prejudice from the default, or that he has suffered a fundamental miscarriage of justice. See Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977) (holding that if the petitioner can show cause for the state procedural default, and prejudice resulting therefrom, the federal courts can address the issue's merits); Murray v. Carrier, 477 U.S. 478, 495-96 (1986) (stating that where a petitioner has suffered a fundamental miscarriage of justice a decision on the merits is appropriate without regard to a procedural default). Because Williams has not established either, his claim is not cognizable in a federal habeas petition. See Coleman, 501 U.S. at 750.

2.

Next, Williams claims that trial counsel were ineffective for failing to use the court-appointed experts in violation of Ake. Like Williams's first claim, this claim was never raised in state court and, therefore, is procedurally defaulted. Because Williams cannot demonstrate cause for and resulting prejudice from the default, or that he has suffered a fundamental miscarriage of justice, this claim is not properly before us on federal habeas review. See Gray, 116 S. Ct. at 2080-81.

3.

Next, Williams asserts that trial counsel were ineffective for failing to prevent the Commonwealth from calling his court-appointed experts as witnesses.[7] In particular, Williams contends that his trial

_____

[7] Williams does not contend that his Sixth Amendment right to counsel was violated when the Commonwealth called as witnesses his court-appointed experts. In Smith v. Moore, 137 F.3d 808 (4th Cir.), cert. denied, 119 S. Ct. 199 (1998), we were recently asked to determine whether "the Sixth Amendment is violated when the State calls a defense-retained psychiatrist as a rebuttal witness." Id. at 819. Because answering that question in the affirmative would have created a new rule of constitutional law, we had no occasion to consider it in a habeas petition. See id. at 820-21.

22

counsel should have objected when Dr. Ryans and Dr. Centor testified that he was a future danger to society. As the district court noted, however, Virginia law does not necessarily bar testimony from court-appointed experts. Indeed, the testimony is admissible so long as the expert does not use "statements or disclosure" made to him by the defendant as part of the basis for forming his opinion on future dangerousness. See Va. Code Ann. § 19.2-264.3. Because the experts' testimony was not based on any statements Williams made but rested solely on Williams's criminal record, any objection would have been futile. As such, trial counsel's performance was simply not deficient. Accordingly, the Virginia Supreme Court's rejection of the claim cannot be deemed an unreasonable application of Strickland.**8**

4.

Finally, Williams argues that trial counsel were ineffective for failing to rebut the damaging testimony of his court-appointed experts. In essence, Williams is upset that trial counsel were unable to find an expert who supported his theory of the case. This Court has made clear, however, that a criminal defendant does not have a right to favorable expert testimony. See Waye v. Murray , 884 F.2d 765, 766-67 (4th Cir. 1989). Thus, that trial counsel were unable to rebut the damaging testimony of his court-appointed experts does not render their assistance ineffective.

V.

Because Williams has failed to provide any grounds upon which habeas relief may be granted, the decision of the district court is affirmed in part and reversed in part.

AFFIRMED IN PART AND REVERSED IN PART
_____
**8** The Danville Circuit Court also found that Williams's prior criminal activity alone was more than sufficient to support a finding of future dangerousness. We agree. As a result, the testimony of Dr. Ryans and Dr. Centor to the same effect was not prejudicial. Thus, even if trial counsels' performance was deficient, it would not warrant relief under Strickland v. Washington, 466 U.S. 668 (1984).