# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 27, 2011

Lyle W. Cayce
Clerk

No. 10-70024

ROBERT LYNN PRUETT,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:06-CV-465

Before JOLLY, GARZA, and STEWART, Circuit Judges.

PER CURIAM:[*]

Robert Lynn Pruett was convicted of capital murder and sentenced to death for the December 17, 1999, murder of correctional officer Daniel Nagle, which took place while Pruett was serving a 99-year prison sentence for a 1995 murder. The district court granted a certificate of appealability ("COA") authorizing Pruett to appeal the denial of habeas relief on two related claims. Pruett requests an expansion of the COA to include an additional claim. For the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-70024

reasons that follow, we AFFIRM the district court's denial of habeas relief and DENY Pruett's request to expand the COA.

I.

Pruett was sentenced to 99 years in prison for his role in the 1995 murder of Ray Yarborough. His father and brother were also convicted for their roles in the Yarborough murder.

On December 17, 1999, while in prison, Pruett missed getting a hot lunch and was given a sack lunch. He attempted to take his lunch into the recreation area, which was in violation of prison rules. Officer Nagle told Pruett that he needed to eat his lunch before going to the recreation area, and wrote a disciplinary charge against Pruett. Later that afternoon, when Nagle was in his office adjoining a multi-purpose room, Pruett stabbed Nagle eight times with a "shank" made of a metal rod sharpened to a point at one end, and wrapped in tape at the other end. According to the autopsy report, Nagle died from a heart attack that he suffered as a result of the trauma caused by the stab wounds. The murder weapon and a torn disciplinary report against Pruett, charging him with attempting to take food into an unauthorized area, were found at the scene of the attack.

John Lee Davis of the Texas Department of Criminal Justice Office of Inspector General testified that after Pruett was arrested, Pruett stated, "Go ahead and run that disciplinary case on me now. Oop[s], I want to call my first witness, Officer Nagle. Oops, he's dead." Davis said that Pruett then began laughing.

Much of the remaining evidence against Pruett consisted of testimony from inmates. Inmates Allen Thompson and Johnny Barnett testified that they were in the multi-purpose room and saw and heard Pruett attacking Nagle. Inmate Anthony Casey testified that he heard Pruett talking about a weapon with another inmate before the attack. Casey, through a recreation yard

window, later saw Pruett near Nagle's desk, and then saw Pruett remove his clothing in a hallway and push it through a gas port into the recreation yard. Inmates James Dale Keller, Robert Michael Lewis, and Jimmy Mullican testified that they witnessed Pruett's attack on Nagle from the craft shop across from the multi-purpose room. Inmate Harold Mitchell testified that he was in the multi-purpose room before the attack. He said that Pruett came into the room and suggested that he leave because Pruett was going to "do something." When Mitchell questioned Pruett, Pruett said that he was going to kill Nagle. According to Mitchell, Pruett said that he was tired of life in prison and wasn't going to kill himself, but didn't have a problem making the State do it for him.

At the guilt-innocence phase of the trial, Pruett testified that he was in prison because "my father killed my neighbor." He said that he was convicted of murder when he was fifteen years old and that he went to the penitentiary when he was sixteen years old. He explained that on December 17, 1999, he was upset about missing a hot lunch and that he cursed at Nagle when Nagle refused to allow him to take his sack lunch into the recreation yard. He said that after he went outside, he saw, through the window, that Nagle was writing a disciplinary report against him. He already had another disciplinary case pending for gambling, which he said was the way he made money for personal items inasmuch as he did not receive any outside financial support. He said that he had cut his hand while lifting weights in the recreation yard, and had used his shirt to stop the bleeding. He said that he later decided to talk to Nagle about the disciplinary case and went to see Nagle, who tore up the report.

Pruett testified that he left Nagle, got some clean clothes, and got in line for the "chow hall." The cut on his thumb reopened and he got more blood on his clothes. Then prison officers made everyone go into the gym, where he heard that Nagle "got whooped." Pruett said that he told the officers, when he was arrested, that "I ain't ever killed nobody in my life."

No. 10-70024

On cross-examination, Pruett denied that he had told inmate Michael Hall that he had killed Nagle.  He also denied telling corrections officer Michael Baumann that he had killed before and would do it again.  He admitted that he had sent inmate Michael Ross a letter, through defense counsel's investigator, just before trial, asking Ross to testify that he (Pruett) had cut his hand on the weights.

In rebuttal, the prosecutor called Michael Hall and Michael Ross.  Each of them testified that Pruett admitted to them that he had killed Nagle.  The prosecutor also called Officer Michael Baumann, who testified that he wrote a disciplinary report on Pruett after Pruett threatened to kill him on August 25, 2001.  Defense counsel called Pruett to the stand again to rebut the testimony of Hall, Ross, and Baumann.

The jury found Pruett guilty of capital murder.

At the punishment phase of the trial, the prosecution called three corrections officers who testified about the disciplinary charges they had reported for Pruett's misconduct.  Jane Yarborough, the wife of Pruett's first murder victim, testified that her husband had been stabbed five to seven times.  The chief of classification at the Connally Unit testified as the custodian of records for Pruett's prison records which were offered into evidence by the prosecution.

Pruett's father testified at the punishment phase that he was incarcerated when Pruett was born.  He said that he met Pruett for the first time when Pruett was seven years old.  He stated that he was in prison for stabbing his neighbor, Ray Yarborough, five or six times.  He explained that when the murder occurred, both of his sons were with him, but they did not know he was going to stab Yarborough.  He testified that he was tried with his sons, and that Pruett was only fifteen years old at the time.  He stated that he was sentenced to life in

prison for Yarborough's murder, Pruett's brother, who was 25 years old at the time, was sentenced to 40 years, and Pruett was sentenced to 99 years.

Pruett's brother testified that his family had been poor and that they were known as gypsies. He said that his father was in and out of the penitentiary and that his mother cleaned houses. He said that he kicked Yarborough, but that Pruett didn't do anything to Yarborough. He also said that Pruett did not threaten anyone when he was sentenced for Yarborough's murder.

Pruett testified again at the punishment phase. He said that his family was poor and moved around a lot. According to Pruett, his mother was "not all the way there mentally," she did not finish high school, and she had physical handicaps. He testified that he had been "getting high" with his parents since he was seven or eight years old, and had used marijuana and cocaine, but not heroin or crack. He testified that he finished the eighth grade in school, but that while he was in prison he had obtained his GED and had completed eighteen hours of college credit. He admitted that he was the cause of Yarborough's murder. He explained that they had argued because he had stolen some guns, Yarborough had taken some of them, and he wanted money for the guns to buy food. He said that his brother and father came to help him, they wrestled with Yarborough, and his father stabbed Yarborough. He also testified to his version of the incidents that were the subject of the disciplinary charges against him.

Robert Chance, an assistant warden at the Polunsky Unit, testified for the defense about the prison classification system and the various security levels. Laura Menn, another witness for the defense, testified that she was a teacher for the prison school district. She stated that she had taught Pruett while he was in prison and that he had been a very good student, did his work, was very bright, and was always very respectful to her. Pruett's cousin, Christine Hinson, testified that Pruett's childhood was dysfunctional, that he was left to roam the

5

streets to look for food, and that her mother fed him because his mother often was away from home for days at a time.

Dr. Gilda Kessner, a clinical psychologist, testified for the defense as follows. Based on her review of records and interviews, Pruett was born into a chaotic family environment, received no nurturing, and grew up in an atmosphere of poverty, crime, and substance abuse. When Pruett was placed in an adult criminal setting as an adolescent he was denied the chance to take advantage of alternatives to adult prison that were available and thus did not have any opportunity to develop his positive qualities.

With respect to Pruett's risk for future dangerousness, Kessner testified that there were no studies or statistical models for inmates who killed while in prison, because the number of such inmates was too small to be statistically reliable. She also testified that the risk of violence decreases as an inmate ages. On cross-examination, she testified that Pruett's behavior that was the subject of the disciplinary charges against him was commonplace behavior for someone who is facing a long sentence. When the prosecutor asked her if Pruett would be a danger to people in the future, she testified that "there is not a zero probability for anybody," but that any risk of future danger that he might present could be managed within the prison system.

In rebuttal, the State called Detective Allen Beall of the Harris County Sheriff's Department, who had investigated the 1995 Yarborough murder. Detective Beall testified that his investigation showed that Pruett punched, kicked, and held Yarborough down during the assault that killed him. He also testified that no guns were found at Yarborough's residence or in his truck. He testified that he was in the courtroom when Pruett was sentenced for the Yarborough murder and that he heard Pruett say that everyone was to stay away from him or he would kill "all of y'all," referring to everyone in court.

No. 10-70024

Warden Thomas Prasifka, of the McConnell Unit, testified in rebuttal for the State that it would not be unusual for an inmate who had been convicted of capital murder to get out of administrative segregation (where he is kept in his cell for twenty-three hours a day and isolated at all times).

The jury answered the special punishment issue on future dangerousness affirmatively, and the special punishment issue on mitigation negatively. Pruett was sentenced to death. His conviction and sentence were affirmed on direct appeal. *Pruett v. State*, No. 74,370, 2004 WL 3093232 (Tex. Crim. App. Sept. 22, 2004) (unpublished). Pruett did not file a petition for a writ of certiorari.

Pruett filed an application for state habeas relief. The state habeas trial court conducted an evidentiary hearing and issued findings of fact and conclusions of law recommending that Pruett's conviction be reversed because the prosecution had violated a pretrial discovery order, but recommending that relief be denied on all of Pruett's other claims. *See Ex parte Pruett*, 207 S.W.3d 767 (Tex. Crim. App. 2005). The Court of Criminal Appeals adopted the trial court's findings and conclusions, except for those upon which the trial court recommended granting relief, and denied state habeas relief. *Id.*

Pruett then filed in federal court a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After hearing oral argument, the district court granted the State's motion for summary judgment and denied federal habeas relief. *Pruett v. Thaler*, No. C-06-CA-465-H (S.D. Tex. Aug. 12, 2010). The district court granted Pruett's application for a COA, authorizing him to appeal the denial of relief as to two related claims. Pruett has asked this Court to grant a COA for an additional claim.

II.

First, we will address the claims for which the district court granted a COA. Then we will turn to consider Pruett's request to expand the COA.

A.

No. 10-70024

The district court granted a COA for Pruett's claims that his rights to due process, effective assistance of counsel, and confrontation were violated (1) by the State's failure to disclose to the defense that Michael Hall and Michael Ross were going to testify that Pruett had admitted to them that he killed Nagle, and (2) by the trial court's refusal to require the State to disclose notes of the State's investigator's interviews with those witnesses. Because those claims are related, we will discuss them together. The Texas Court of Criminal Appeals denied relief on these claims on the ground that there is no federal constitutional right to discovery in a criminal case. *Ex parte Pruett*, 207 S.W.3d at 767. Because these claims were adjudicated on the merits by the Texas Court of Criminal Appeals, our consideration of them is governed by 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "A state-court decision will also be contrary to . . . clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different

8

from [Supreme Court] precedent." *Id*. at 406. "A state-court decision involves an unreasonable application of [Supreme Court] precedent if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id*. at 407. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (internal quotation marks and citation omitted).

Prior to trial, Pruett filed a motion for discovery. The trial court granted his request to require the State to disclose certain evidence, including "the substance of any oral statements made by the accused . . . and a list of witnesses to the making and acknowledgment of such statement." The trial court denied his request for "the names and addresses of witnesses the State intends to call in rebuttal, together with information required to be disclosed in connection with other witnesses and a specific statement as to the substance of the testimony such witnesses will give at the trial of the cause."

As we have already noted, Pruett testified at the guilt-innocence phase and denied that he killed Nagle. On cross-examination, the prosecutor asked Pruett if he had told Michael Hall that he had killed Nagle, and that he just couldn't stop himself. Pruett denied making such statements. In the middle of his cross-examination, at a bench conference outside the presence of the jury, the prosecutor stated that the State was going to call Michael Ross to rebut Pruett's denial that he murdered Nagle, and to relate how Pruett had asked Ross to testify falsely about some of the facts of the murder. Defense counsel did not object. Later, after the remaining defense witnesses had testified, the prosecutor stated to the court and defense counsel that he was going to call four rebuttal witnesses, including Michael Hall and Michael Ross.

No. 10-70024

The prosecutor called Michael Hall as the State's first rebuttal witness, with no objection from the defense. Hall testified that Pruett had admitted to him that he had stabbed Nagle. Prior to cross-examining Hall, defense counsel asked if Hall had made a written statement. The prosecutor responded that he had not, and that all the prosecution had was work product consisting of notes taken during an interview. The prosecutor had used those notes while conducting direct examination. Defense counsel cross-examined Hall, asking him questions about who he had discussed his testimony with, what he was convicted of, and whether he had been promised a letter recommending parole in exchange for his testimony.

Ross was also called to testify without objection. Ross initially had been on Pruett's witness list. Ross testified that Pruett had admitted to him that he had stabbed Nagle. Ross also testified that he had been shown a letter from Pruett by the defense investigator, Jim Dickson. In that letter, Pruett had asked Ross if he "remembered" that Pruett had cut his hand while lifting weights. Ross stated that he told Dickson that there was nothing he could do for Pruett. On cross-examination, Ross, who was serving a 99-year sentence, testified that he would receive a "safe passage" in return for his testimony. He explained that "safe passage" meant that his safety would be guaranteed for the remainder of his sentence. Defense counsel did not ask for any notes or statements prior to or during his cross-examination of Ross.

After both Hall and Ross had testified, defense counsel complained, outside the presence of the jury, that the prosecution had failed to disclose to the defense that Pruett had admitted to Hall and Ross that he had killed Nagle. The prosecutor argued that the discovery order did not apply to rebuttal witnesses.

Three days later, Pruett filed a motion for a mistrial or to strike the rebuttal testimony of Hall and Ross. Defense counsel argued that the discovery order required the State to disclose the names of the witnesses as well as the

10

statements that Pruett had made to them.  The State argued that because the evidence came during rebuttal, it was not required to be disclosed under the terms of the pretrial order. The trial court denied the defense motion for a mistrial or to strike the rebuttal testimony of Hall and Ross.

The state habeas trial court judge (who was not the same judge who had entered the pretrial discovery order and conducted the trial) found that the State intentionally failed to disclose Pruett's admissions to Hall and Ross, in violation of the discovery order, and recommended that Pruett's conviction be reversed. The judge reasoned that, although the discovery order had denied Pruett's request for the identities and substance of the testimony of rebuttal witnesses, other provisions of the discovery order required disclosure.  He concluded that the State's investigator's notes taken during the interviews of Hall and Ross constituted witness statements under the Texas Rules of Evidence, that the notes contained unspecified inconsistencies with trial testimony, and that the defense was entitled to use those notes in cross-examination.  The judge concluded that the State had acted in bad faith in deliberately disregarding the pretrial discovery order to obtain an advantage.  He concluded further that the trial judge had abused his discretion in allowing the testimony about Pruett's inculpatory statements and in denying the defense access to the investigator's interview notes.  He found that the defense was impaired because defense attorneys have a right to depend on prosecutors' complying with pretrial discovery orders, and the defense was not in a position to anticipate the testimony.

In *Wooten v. Thaler*, our court observed that "there is a line of authority that leaves open the possibility that a defendant who is *deliberately* misled as to the full weight and import of the state's evidence might have a cognizable due process claim." 598 F.3d 215, 220 (5th Cir. 2010) (citing *Gray v. Netherland*, 518 U.S. 152, 165-66 (1996)).  Although the state habeas trial court found that the

State intentionally failed to disclose Pruett's admissions to Hall and Ross, and concluded that the State had acted in bad faith in deliberately disregarding the pretrial discovery order to obtain an advantage, the Texas Court of Criminal Appeals did not adopt those findings of fact and conclusions of law.[1] Accordingly, even if the "possibility" of a cognizable due process claim based on deliberate deception "rises to the level of clearly established law sufficient to support a habeas petition on AEDPA review," *id.* at 221, the Texas Court of Criminal Appeals did not adopt the state habeas trial court's finding of deliberate deception. In rejecting Pruett's claims, the Court of Criminal Appeals stated:

> According to the United States Supreme Court, "There is no general constitutional right to discovery in a criminal case." [*Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Ruiz*, 536 U.S. 622, 629 (2002).] Although the Due Process Clause confers upon defendants a right to be informed about the existence of *exculpatory* evidence, it does not require the prosecution to "reveal before trial the names of all witnesses who will testify unfavorably." [*Bursey*, 429 U.S. at 559.] As for the trial court's conclusion that the failure to reveal the inculpatory statements also violated the rules of evidence and the trial court's discovery order, such violations, even if they occurred, would not be grounds for relief on habeas corpus. [*Ex parte Pena*, 71 S.W.3d 336, 336-337 (Tex. Crim. App. 2002) (habeas relief unavailable for a claim that does not involve a jurisdictional defect or a violation of constitutional or fundamental rights).]

*Ex parte Pruett*, 207 S.W.3d at 767 (footnotes in brackets).

Pruett argues that the State's violation of the pretrial discovery order violated his due process rights and his right to the effective assistance of counsel. He points out that his conviction is based on the testimony of convicted felons

---

[1] Pruett contends that the Texas Court of Criminal Appeals did not explicitly reject the trial court's findings and conclusions that the state had acted in bad faith in withholding the information and disregarded the pretrial order to obtain an advantage. This is not correct. The Texas Court of Criminal Appeals stated: "We adopt the trial court's findings of fact and conclusions of law, except for the trial court's findings and conclusions on grounds ten and eleven [the claims at issue]." *Ex parte Pruett*, 207 S.W.3d at 767.

who were prisoners of the prosecution and thus had both a motivation to lie and the lack of character to act on that motivation. He asserts that the State's failure to disclose his admissions to Hall and Ross, along with the trial court's refusal to order disclosure of the investigator's interview notes for cross-examination, affected his decision whether to testify, prevented defense counsel from conducting a pretrial investigation to counter the testimony, and deprived him of the opportunity to discredit the inmate testimony and bolster his defense that all of the inmate testimony against him was unreliable. He contends that the nondisclosure violated his right to due process because the due process clause requires a fair trial and requires the prosecution to refrain from improper methods calculated to produce wrongful conviction. He argues that the trial court's refusal to order disclosure of the interview notes violated his right to due process under *Jencks v. United States*, 353 U.S. 657 (1957), and limited his right to cross-examine Hall and Ross, in violation of the Confrontation Clause. Pruett insists that his claim has nothing to do with the Constitution not requiring discovery in a criminal case. Instead, he maintains that it concerns the State's duty to follow lawful court orders in the prosecution of a death penalty case. Pruett also contends that because the prosecution intentionally gave defense counsel a false picture of the State's evidence, his counsel were unable to prepare his defense and thus were rendered ineffective.

The Texas Court of Criminal Appeals did not unreasonably deny relief on these claims. As that court noted, the Supreme Court of the United States has held that "There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). The Supreme Court stated in *Bursey* that "[i]t does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably." *Id.* Accordingly, the Texas Court of Criminal Appeals did not unreasonably apply clearly established

law when it rejected Pruett's claim that the State denied him the right to a fair trial by failing to identify Hall and Ross as rebuttal witnesses. Further, the Texas Court of Criminal Appeals did not unreasonably reject Pruett's claims regarding the failure to turn over the investigator's notes from the interviews of Hall and Ross. Although the state habeas trial court stated in its conclusions of law that there were inconsistencies between the trial testimony of Hall and Ross and the interview notes, it made no factual findings revealing any such inconsistencies. Further, the Texas Court of Criminal Appeals did not adopt that conclusion. Pruett, likewise, has not identified any inconsistencies between Ross's and Hall's testimony and the interview notes and thus he has failed to adequately brief this claim. *See Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir.2005) ("In his petition to this Court, Petitioner merely lists his ineffective assistance complaints in summary fashion, without discussing the legal and factual basis for each complaint. In failing to brief his ineffective assistance of counsel complaints adequately, Petitioner has waived those claims.").

*Jencks*, which requires federal prosecutors to disclose written statements to the defense, does not apply to state criminal proceedings. *Martin v. Maggio*, 711 F.2d 1273, 1283 (5th Cir. 1983). Pruett's rights under the Confrontation Clause were not violated, because the trial court did not restrict defense counsel's cross-examination of Hall and Ross. In the light of the evidence of his guilt, Pruett cannot show that not knowing the identities of Hall and Ross as rebuttal witnesses, and not having the investigator's notes from their interviews of Hall and Ross, had a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Because the decision of the Texas Court of Criminal Appeals is neither contrary to, nor an unreasonable application of, clearly established federal law, the district court did not err by denying habeas relief on these claims.

No. 10-70024

B.

Having determined that Pruett is not entitled to habeas relief on the claims for which the district court granted a COA, we now turn to consider his request for an expansion of the COA for his claim that the admission of a summary of the facts underlying his prior murder conviction violated his rights under the Confrontation Clause.

To obtain a COA, Pruett must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a district court has rejected the constitutional claims on the merits, . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *id.*, "or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citation omitted). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. In making the decision whether to grant a COA, this court's examination is limited to a "threshold inquiry," which consists of "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 327, 336. The court cannot deny a COA because it believes the petitioner ultimately will not prevail on the merits of his claims. *Id.* at 337. On the other hand, however, "issuance of a COA must not be *pro forma* or a matter of course." *Id.* "While the nature of a capital case is not

of itself sufficient to warrant the issuance of a COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (brackets, internal quotation marks, and citations omitted).

The evidence at issue is entitled "Case Summary." It is one of 79 pages in State's Exhibit 62, which contains Pruett's prison classification records. The Case Summary states, in its entirety:

> <u>MURDER WITH A DEADLY WEAPON</u>: The official version states that on 8-9-95 in Houston, Harris County, Texas, the subject, his brother and father (Howard PRUETT Sr., LIFE sentence and Howard PRUETT Jr., 40 years TDCJ-ID) assaulted an adult white male neighbor. The victim and the subject originally got involved in an argument over the subject selling him some stolen guns and the subject dating the victim's daughter. The victim ordered the subject to stay away from his residence and he and the subject became involved in an argument. The subject tried to get other friends of his to join in killing the victim that same night, without success. When the subject got home, he got his father and brother to join him in jumping on the victim, beating him and kicking him. The subject's father stabbed the victim 6-7 times while the victim was on the ground. The victim managed to get up and run away from his assailants but they followed him and continued attacking him. The victim died as a result of his stab wounds. The subject and codefendants fled Harris County and went to Orange, Texas, where they were arrested 2 weeks later. At the time of the arrest, the subject fled through a window but was arrested a short distance away. The subject was 16 years old when this offense occurred and he was certified to stand trial as an adult. The subject wrote letters from the jail where he bragged about the MURDER to his friends. He also threatened to kill a witness from the jail. After the jury sentenced the subject, the subject "fainted" and when he "awoke", he tore off his shift and stated "you better watch out for

No. 10-70024

me. I'm going to kill every mother fucker I see." The subject had to be restrained and removed from the court room by deputies. There was no bond for this offense.

RATIONALE OF PRESENT OFFENSE "MY DAD STABBED HIM."

On direct appeal, the Texas Court of Criminal Appeals held that the only portion of Pruett's claim regarding the Case Summary that was preserved for review was his claim that the exhibit was inadmissible because the records contained in it "were compiled for the purpose of litigation." 2004 WL 3093232, at *5. The court rejected that claim on the merits, holding that the records were not actually created in anticipation of litigation, but merely compiled for use at trial. *Id.*

Pruett raised the claim again in his state habeas application. The state habeas trial court found that the Case Summary was created on October 18, 1996, more than three years prior to Nagle's murder. The court rejected Pruett's claim for three reasons. First, the court concluded that the claim was procedurally barred under state law because, although Pruett's counsel objected to the packet of materials in which the Case Summary was included, they did not object to the Case Summary with sufficient specificity to make the trial court aware of their arguments regarding its inadmissibility. Next, the state habeas trial court concluded that the Case Summary was admissible as a business record because it existed prior to trial, was not prepared for the purpose of litigation, and was introduced after appropriate testimony from the custodian of records. Finally, the state habeas court concluded that the same evidence was admitted from other sources, without objection, both before and after the guilty verdict. The Texas Court of Criminal Appeals adopted these findings and conclusions. *Ex parte Pruett*, 207 S.W.3d at 767.

No. 10-70024

The district court held that, assuming that the claim is not procedurally defaulted and that admission of the Case Summary was erroneous, any error in was harmless. The district court stated:

> [T]he jury knew from other evidence that Petitioner was serving a 99 year sentence for the murder of Ray Yarborough at the time the murder of Nagle occurred . . . . The jury had heard testimony as to the details of the previous murder, including evidence that Petitioner punched, kicked, and held down Yarborough during the assault and that he threatened to kill everyone in the courtroom upon being convicted . . . . They had also heard evidence that he had committed disciplinary infractions while in prison, which included fighting, trying to manufacture a weapon, and making repeated threats of physical violence against guards . . . . Of course, it was undisputed that Nagle, the victim in this capital murder case, was a correctional officer in the facility in which he was incarcerated.
>
> Turning to the case and offense summaries, we find the following facts reported concerning the Yarborough murder: Petitioner solicited the murder, he tried to escape when arrested, he bragged about the murder, he tried to kill witnesses from jail, and he was not remorseful . . . . All of these details were certainly prejudicial. However, when considered in conjunction with the evidence the jury already had in its possession, it is difficult to conclude that this evidence had a "substantial and injurious effect" on Petitioner's sentence. The jury was confronted with overwhelming evidence that Petitioner would pose a continuing threat to society, the most important being that they had just convicted him of murdering an officer in a correctional institution. It strains credulity to the breaking point to suggest that a reasonable jury confronted with all of the evidence *except* the summary reports would conclude that Petitioner did *not* pose a continuing threat to society. Accordingly, the error, if any, in admitting the case and offense summaries did not have a "substantial and injurious effect" on the sentence and was harmless.

*Pruett v. Thaler*, No. C-06-CA-465-H, at 11-12.

Pruett argues that he made a proper objection and that the admission of the Case Summary violated his rights under the Confrontation Clause because

the Case Summary was the product of police investigation and interrogation and was therefore testimonial.  He contends that the error was not harmless because the case summary was the only evidence of these damning facts:  (1) Pruett tried to recruit his friends to commit the 1995 murder; (2) Pruett solicited his brother and father to commit the murder; (3) Pruett tried to escape when he was arrested; (4) Pruett bragged about the murder; (5) Pruett tried to kill witnesses from jail; and (6) Pruett was not remorseful.  He contends that it also shows premeditation, adding weight to the State's proposition that Nagle's murder was also planned; shows future dangerousness in that he tried to escape and tried to have witnesses killed from jail; and negates mitigating evidence bearing on Pruett's moral and personal culpability.  He points out that in closing argument, the prosecutor referred to the Case Summary as contradicting Pruett's testimony and showing that he was a future danger.

Pruett concedes that the district court was probably correct in concluding that future dangerousness was a given because Pruett was in prison, and the jury had found that he killed his prison guard.  However, he points out that the jury also had to consider mitigating circumstances.  He maintains that the Case Summary added significant weight to the State's case for death and made his sentence unreliable.

In *Crawford v. Washington*, 541 U.S. 36 (2004), which was decided several months before the Texas Court of Criminal Appeals handed down its decision on Pruett's direct appeal, the Supreme Court held that the Confrontation Clause forbids admission of out-of-court testimonial statements against a criminal defendant unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant.  *Id*. at 68.  The Court declined in *Crawford* to "spell out a comprehensive definition of 'testimonial,'" but stated that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  *Id*.  In *Melendez-*

*Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), the Court stated that "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because–having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial–they are not testimonial." *Id.* at 2539-40.

The State argues that *Crawford* did not disturb the Supreme Court's earlier holding, in *Williams v. Oklahoma*, 358 U.S. 576, 584 (1959), that the Confrontation Clause generally does not apply to sentencing and does not prevent the introduction of hearsay at a sentencing hearing. *See United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006) (stating that "there is no *Crawford* violation when hearsay testimony is used at sentencing, rather than at trial"). The State also points out that the Case Summary was not prepared for purposes of litigation. It was prepared in October 1996, for prison classification purposes, after Pruett had been sentenced to prison for Yarborough's murder, and more than three years before he murdered Nagle.

We need not decide whether the Case Summary is testimonial, or whether *Crawford* applies to evidence presented at a sentencing hearing in a death penalty case, because we are convinced that reasonable jurists would not find debatable the district court's decision that any error in admitting the Case Summary was harmless.

As the district court correctly noted, the Case Summary is substantially cumulative of other evidence of Pruett's role in the Yarborough murder. In response to questioning by his own counsel, Pruett testified at the guilt-innocence phase that he previously had been convicted of murder. At the punishment phase, Pruett admitted that he started the confrontation with Yarborough, although he denied making threats in the courtroom after he was sentenced for Yarborough's murder. During the State's rebuttal at the

punishment phase, Detective Allen Beall of the Harris County Sheriff's Department testified, without objection, that his investigation showed Pruett punched, kicked, and held Yarborough down during the assault; that Yarborough did not have any guns in his possession; and that, at sentencing, Pruett told everyone in the courtroom to stay away from him or he would kill all of them.

In the light of this evidence, reasonable jurists would not find debatable the district court's decision that any error in the admission of the Case Summary did not have a substantial and injurious effect or influence on the jury's determination of Pruett's sentence and was, therefore, harmless. *See Brecht*, 507 U.S. at 637. Accordingly, we DENY Pruett's request for expansion of the COA.

### III.

For the foregoing reasons, the judgment of the district court is AFFIRMED and Pruett's request for expansion of the COA is DENIED.